UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ENZO BIOCHEM, INC. ET AL.,          :
        Plaintiffs,                 :
                                    :        No. 3:04cv929 (JBA)
v.                                  :
                                    :
APPLERA CORP. ET AL.,               :
        Defendants.                 :

## RULING AND ORDER ON GENERAL ELECTRIC'S MOTION TO INTERVENE FOR LIMITED PURPOSE AND MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL [DOC. #121]

On May 23, 2006, General Electric ("GE") moved to intervene in this action pursuant to Fed. R. Civ. P. 24 for the limited purpose of seeking to disqualify plaintiffs' counsel, Hunton & Williams LLP ("Hunton").  As GE is only moving to intervene in this case for the limited purpose of filing its motion to disqualify plaintiff's counsel, and GE has a demonstrated interest in ensuring that Hunton's representation of Enzo in this action does not compromise its attorney-client relationship with Hunton, the Court grants GE's motion to intervene pursuant to Fed. R. Civ. P. 24(a) in order to consider its motion to disqualify.  See, e.g., Oxford Systems, Inc. v. CellPro, Inc., 45 F. Supp. 2d 1055, 1058 (W.D. Wash. 1999); GATX/Airlog Co. v. Evergreen Int'l Airlines, Inc., 8 F. Supp. 2d 1182, 1188 (N.D. Cal. 1998).

GE claims that Hunton's representation of Enzo in this action is directly adverse to GE in violation of Rule 1.7(a) of

1

the Connecticut Rules of Professional Conduct.  The issue before
the Court is whether Hunton can represent a plaintiff in one case
where the subject matter has significant overlap with that in
another case in which that same plaintiff (represented by
different counsel) is suing a client of Hunton's.  The Court
concludes based on the record before it that Hunton's
disqualification is not warranted, and GE's motion to disqualify
is therefore DENIED.

**I. Factual and Procedural Background**

Plaintiffs Enzo Biochem, Inc. and Enzo Life Sciences, Inc.
(collectively "Enzo"), and Yale University ("Yale") filed suit
against defendants Applera Corp. ("Applera") and Tropix Inc.
("Tropix") on June 7, 2004, claiming patent infringement under 35
U.S.C. §§ 271, et seq.  (See Compl. [Doc. #1] at 1.)  Six patents
concerning techniques and processes for the detection of nucleic
acids are the subject of the case: U.S. Patent Nos. 5,476,928
("Ward '928 Patent"), 5,449,767 ("Ward '767 Patent"), 5,328,824
("Ward '824 Patent"), 4,711,955 ("Ward '955 Patent"), 5,082,830
("Brakel Patent"), and 4,994,373 ("Stavrianopoulos Patent").
(See id. at 1-2.)  The Court issued its Claim Construction Ruling
on the disputed claims and terms of these patents on October 13,
2006.  (See [Doc. #137].)

On July 17, 2006, a claim construction ruling covering some
of the same terms and claims of these patents was issued in Enzo

Biochem, Inc., et al. v. Amersham PLC, et al., 439 F. Supp. 2d 309 (S.D.N.Y. 2006).  Due to some divergent constructions by the two courts, this Court certified Applera for interlocutory appeal to the Federal Circuit pursuant to 28 U.S.C. 1292(b) [Doc. #137]. The Federal Circuit denied both Enzo's and Applera's petitions for permission to bring this interlocutory appeal on November 27, 2006.

The Amersham action was commenced on October 23, 2002 (GE Mot. [Doc. #121] at 2-3).  In October 2003, GE announced its acquisition of Amersham, which was finalized April 8, 2004.  (See GE Mot. at 3.)  Also in October 2003, Enzo retained Hunton to prepare the Applera action, which was filed in June 2004.[1]  (See Fedus Aff., Pls. Ex. 6, ¶ 3.)  Enzo retained Greenberg Traurig LLP ("Greenberg") in the Amersham action in mid-2004.  (See Fedus Aff., Pls. Ex. 6 [Doc. #127-16], ¶ 2.)

According to GE, it is "a long-standing client" of Hunton's — the division GE Healthcare has been a client of Hunton's since November 14, 2001 (Schulman Aff., Pls. Ex. 3 [Doc. #127-5], ¶ 3) — and Hunton "continues to represent GE on various matters, including intellectual property matters."  (GE Mot. at 3.)

In July 2005, Hunton associates Jeffrey Perez and David

---

[1] Ronald C. Fedus, Enzo's Corporation and Patent Counsel, represents that "since at least 2001, Hunton has advised Enzo with repect to its patent and interference rights vis-a-vis Applera."  (Fedus Aff., Pls. Ex. 6 ¶ 3.)

Kelly, and Hunton partner Scott Robertson attended the <u>Markman</u>
hearing in <u>Amersham</u>.  (<u>See</u> Pls. Opp. Mem. [Doc. #127-2] at 7;
Robertson Aff., Pls. Ex. 7 [Doc. #127-17], ¶ 10.)  On August 4,
2005, at a deposition of inventor Dr. David C. Ward in <u>Amersham</u>,
Hunton lawyer Jeffrey Perez was in attendance and "appeared" "for
Biochem, Inc."  (Ward Dep. Tr., GE Ex. I-A [Doc. #121-2], at
579.)  At the deposition, Amersham's counsel Jennifer A. Sklenar
engaged in the following colloquy with Greenberg attorney Scott
J. Bornstein and Yale's attorney Levina Wong after the witness
was questioned about a conversation he had with Hunton attorney
Perez regarding distribution agreements:

> Q (Mr. Ulmer, counsel for defendant Affymetrix).  In the
> preparation session that you had for this deposition that
> Mr. Perez attended, did he say anything at the — in that
> session?
>
> A (Mr. Ward).  No.  Mr. Bornstein was the one who did the
> majority of the talking, . . .
>
> Q.  But Mr. Perez did speak, right?
>
> A.  Yes.
>
> Q.  Do you recall anything that Mr. Perez said?
>
>     Mr. Bornstein: You can answer that yes or no.
>
>     The Witness: Yes.
>
> Q.  (By Mr. Ulmer) What was that?
>
>     Mr. Bornstein: (speaking to the witness) I'm going
> to direct you not to answer on the basis of the
> attorney-client privilege.
> . . .
>     Ms. Sklenar: Just so we have it clear on the

record, are you taking the position that for
conversations that Hunton & Williams participates in
that there is a privilege?

     Ms. Wong: Yes.
     . . .
     Mr Bornstein: I'm happy to tell you, as you know,
that Hunton & Williams represents Enzo in connection
with litigation.

     Ms. Wong: Hunton & Williams also represents Yale
in connection with the Enzo litigation.

(Id. at 679-81.)

Based on Perez's appearance at that deposition, chief

litigation counsel of GE Healthcare, Patrick Murphy, avers that

he "immediately complained to Hunton's litigation chairman,

Thomas Slater" by phone and email in July and August 2005.

(Murphy Aff., GE Ex. II [Doc. #121-3], ¶ 6.)  According to

Murphy, "Slater assured me that this cross-over had been

inadvertent and that Hunton would not participate in activities

adverse to GE.  Specifically, Hunton promised to maintain an

ethical wall between the Connecticut action and the New York

action."  (Id.)  Slater states that,

    On June 7, 2005, Pat Murphy of GE Healthcare called me
    to discuss Hunton & Williams' participation in the Enzo
    case.  After talking to Murphy . . ., I communicated
    with my partner Scott Robertson, . . . [who] assured me
    that Hunton & Williams was not assisting the Greenberg
    lawyers in the Amersham case, but that we needed to
    talk to them on occasion in order to properly represent
    Enzo in the action against Applera in this Court.

(Slater Aff., Pls. Ex. 5 [Doc. #127-6], ¶ 4.)  Slater represents:

"I again contacted my partner Scott Robertson.  I learned from

5

Robertson that to the extent that Jeff Perez had stated that he was appearing for Enzo in the New York Action, Perez had misspoken" (Slater Aff., Pls. Ex. 5, ¶ 6).

On August 31, 2005, Robert Schulman, Hunton IP partner in charge of GE Healthcare, wrote an email to Robertson, Slater, and others describing his conversation with Carl Horton, Chief Patent Counsel in GE Healthcare's legal department: Horton had discussed "Murphy's concerns with respect to our Enzo representation. . . . with [Murphy] . . . [and] as far as he can tell, [Murphy] is satisfied with the current arrangement." (Schulman Aug. 31, 2005 email, Pls. Ex. 3-A [Doc. #127-5].)

On March 31, 2006, a conference call was held among counsel in <u>Amersham</u>.  During this call, according to Sklenar, Greenberg "stated that Enzo intended to seek leave from Judge Sprizzo to file in the New York cases a claim construction submission that Enzo was also filing in its case against Applera." (Sklenar Aff., GE Ex. I [Doc. #121-2], ¶ 3.)  Sklenar notes that this claim construction document [Doc. #114] relating to a disputed term[2] "was filed on April 6, 2006, six days after [the] conference call" (Sklenar Aff., GE Ex. I, ¶¶ 3, 4).  Robertson explains: "As a courtesy, . . . Hunton attorneys informed Greenberg that it would be submitting this supplemental briefing

---

[2] The chart concerns the "A" moiety in the '824 and '767 patents.  (<u>See</u> Bornstein Letter, Pls. Ex. 8-A, at 2.)

in the Connecticut Action.  Thereafter, Hunton attorneys learned that Greenberg intended to inform the Court in the New York Action of this supplemental briefing, and sought leave to submit the chart in that litigation."[3]  (Robertson Aff., Pls. Ex. 7 [Doc. #127-17], ¶ 9.)  According to Bornstein, Judge Sprizzo "declined to accept the supplemental chart" on May 12, 2006 (Bornstein Aff., Pls. Ex. 8 [Doc. #127-18], ¶ 10).

Also on April 6, 2006, Schulman wrote an email to Horton, copied to Robertson, Slater, and others at Hunton, stating that Hunton lawyers would "refrain from attending any hearings or depositions in the New York case" but "considered it proper to receive assistance from Greenberg counsel to help us in our Connecticut case;" and that because "we undertook the representation of Enzo in this case before GE acquired Amersham. . . . our representation does not create any 'ethical' conflict under the DC rules."  (Schulman Apr. 6, 2006 email, Pls. Ex. 3-B [Doc. #127-5].)  On April 16, 2006, Horton responded to Schulman: "GE's acquisition of Amersham was announced October 2003 and completed April 2004.  Enzo sued Applera in June of 2004.  Thus, I don't understand the 'thrust upon' argument unless Hunton is going to argue that it was preparing to file Enzo's case against

---

[3] Greenberg requested that the claim construction chart be admitted in an April 18, 2006 letter to Judge Sprizzo.  (See Bornstein Letter, Pls. Ex. 8-A.)

Applera for more than 8 months." (Horton Apr. 16, 2006 5:55 a.m. email, Pls. Ex. 3-C [Doc. #127-5].) Horton also clarified that at the Ward deposition, "Hunton lawyer [Perez] announced on the record that he was appearing for Enzo, he conferred with the witness and the Greenberg lawyer during the breaks, and was involved in preparing the witness." (Id.) That same day, Schulman responded to Hunton, representing that, "I am certain that as of April '04, we were deeply into this case;" "please do not lose sight of the fact that our particular engagement is against Apelera [sic], not Amersham;" "none of the attorneys working for GE [Healthcare], myself included, is working on the litigation;" "As for the Ward deposition, I had been told by Jeff Perez that such had occurred in June and this information turned out to be inaccurate;" and "the date of the Ward deposition was Aug. 2-5, 2005 and the date of the internal communication at Hunton prohibiting further collaboration with Greenberg in their case was August 9, 2005." (Schulman Apr. 16, 2006 email, Pls. Ex. 3-C.) Finally, Horton responded again that same day, assuring Schulman, "just so you know, I have absolutely NO issue with this whole thing. . . . But, it is getting dicey." (Horton Apr. 16, 2006 6:45 p.m. email, Pls. Ex. 3-C.)

Then, according to Hunton's Slater, on April 27, 2006 Murphy and GE Vice President for Litigation and Legal Policy John Graham contacted Slater to inform him that GE planned to move for

8

disqualification.  (Slater Aff., Pls. Ex. 5, ¶ 11.)  Despite
subsequent conversations and negotiations between GE and Hunton,
GE filed the motions [Doc. #121] on May 23, 2006.

In a July 4, 2006 declaration, Horton expressed a changed
perspective: "I have since learned that Hunton and Greenberg
Traurig appear to be regularly discussing their respective
positions on important issues such as claim construction.  Such
conduct is completely at odds with Hunton's representations to me
of a strict ethical wall between the two cases."  (Horton Aff.,
Pls. Reply Mem. Ex. [Doc. #131], ¶ 7.)  He further stated, "I
have concluded that Hunton's representation of Enzo in the
Connecticut case has created an unavoidable conflict of interest
with respect to its client, GE."  (Id. ¶ 10.)

After this Court issued its Claim Construction Ruling on
October 12, 2006, GE moved [Doc. #139] and was granted leave
[Doc. #143] to file a supplemental brief [Doc. #140] in further
support of its Motions, wherein GE argues that, "Should the
Federal Circuit decide to hear the interlocutory appeal, Hunton
will inevitably argue — indeed, it must argue — that many, if not
most, of Judge Sprizzo's claim constructions were faulty.  Thus,
Hunton cannot avoid directly attacking a ruling favorable to its
client, General Electric, in the New York case."  (GE Supplem.
Br. [Doc. #140] at 2.)  Plaintiffs responded by stating that,
"the Federal Circuit rarely exercises its jurisdiction to hear

9

interlocutory appeals of such issues," and that even it if did, "Hunton's representation of Plaintiffs before the Federal Circuit would not rise to the level of direct adversity." (Pls. Br. in Opp. [Doc. #142] at 3.)  The Federal Circuit has since declined to grant the parties permission to pursue the interlocutory appeal, and at oral argument, Hunton represented that it has decided it will not represent Enzo on any appeal in this case.

## II. Legal Standard for Disqualification

"A district court has 'substantial latitude' to require disqualification." United States v. Zichettello, 208 F.3d 72, 104 (2d Cir. 2000) (citing Wheat v. United States, 486 U.S. 153, 163, (1988); United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993)).  A court's authority to disqualify an attorney "derives from [its] inherent power to preserve the integrity of the adversary process." Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) (internal quotation omitted).  "In exercising this power, [courts] attempt[] to balance a client's right freely to choose his counsel against the need to maintain the highest standards of the profession." Id.  The moving party bears "the heavy burden of proving facts required for disqualification," see Evans v. Artek Sys. Corp., 715 F.2d 788, 794 (2d Cir. 1983), and the Second Circuit has adopted "a restrained approach that focuses primarily on preserving the integrity of the trial," see

10

<u>Armstrong v. McAlpin</u>, 625 F.2d 433, 444 (2d Cir. 1980), <u>vacated</u>
<u>on other grounds</u>, 449 U.S. 1106 (1981).

Accordingly, although courts' "decisions on disqualification
motions often benefit from guidance offered by the American Bar
Association (ABA) and state disciplinary rules . . . such rules
merely provide general guidance and not every violation of a
disciplinary rule will necessarily lead to disqualification."
<u>Hempstead Video</u>, 409 F.3d at 132; <u>accord</u> <u>United States Football</u>
<u>League v. Nat'l Football League</u>, 605 F. Supp. 1448, 1463 n.31
(S.D.N.Y. 1985) ("While the [Code of Professional Responsibility]
is a source by which courts may be guided, it is not the final
word on disqualification.  Courts are not policemen of the legal
profession; that is for the disciplinary arm of the bar.
Disqualification is granted to protect the integrity of the
proceedings, not to monitor the ethics of attorneys' conduct.").
In the Second Circuit, "[r]ecognizing the serious impact of
attorney disqualification on the client's right to select counsel
of his choice, we have indicated that such relief should
ordinarily be granted only when a violation of [professional
rules of conduct] poses a significant risk of trial taint."
<u>Glueck v. Jonathan Logan, Inc.</u>, 653 F.2d 746, 748 (2d Cir. 1981)
(citing <u>Armstrong v. McAlpin</u>, 625 F.2d 433, 444-46 (2d Cir. 1980)
(en banc), vacated on other grounds and remanded, 449 U.S. 1106,
101 S. Ct. 911 (1981); <u>Bd. of Educ. v. Nyquist</u>, 590 F.2d 1241,

11

1246 (2d Cir. 1979)).

Finally, courts must balance three competing interests in deciding whether to disqualify counsel: "(1) the client's interest in freely selecting counsel of her choice, (2) the adversary's interest in the trial free from the risk of even inadvertent disclosures of confidential information, and (3) the public's interest in the scrupulous administration of justice." Hull v. Celanese Corp., 513 F.2d 568, 570 (2d Cir. 1975).

## III. Discussion

### A. Rule 1.7(a) and Concurrent Conflicts Generally

Rule 1.7(a) of the Connecticut Rules of Professional Conduct provides in relevant part:

> (a) Except as provided in subsection (b),[4] a

---

[4] Subsection (b) reads:

> (b) Notwithstanding the existence of a concurrent conflict of interest under subsection (a), a lawyer may represent a client if:
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or the same proceeding before any tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.

Conn. R. Prof'l Conduct 1.7(b). As the four requirements of this subsection are in the conjunctive, and there is no evidence presented that GE gave its informed, written consent to the asserted conflict (factor (4)), subsection (b) does not apply.

12

lawyer shall not represent a client if the
representation involves a concurrent conflict of
interest. A concurrent conflict of interest exists if:
    (1) the representation of one client will be
directly adverse to another client; . . .

The Commentary to the Rule says of the phrase "directly adverse"

in subsection (a)(1):

    [A]bsent consent, a lawyer may not act as advocate in
    one matter against a person the lawyer represents in
    some other matter, even when the matters are wholly
    unrelated. . . .  Similarly, a directly adverse
    conflict may arise when a lawyer is required to cross-
    examine a client who appears as a witness in a lawsuit
    involving another client, as when the testimony will be
    damaging to the client who is represented in the
    lawsuit.

Conn. R. Prof'l Conduct 1.7 cmt.  Another section of the

Commentary speaks to the issue of positional versus direct

conflict:

    Ordinarily a lawyer may take inconsistent legal
    positions in different tribunals at different times on
    behalf of different clients.  The mere fact that
    advocating a legal position on behalf of one client
    might create precedent adverse to the interests of a
    client represented by the lawyer in an unrelated matter
    does not create a conflict of interest.  A conflict of
    interest exists, however, if there is a significant
    risk that a lawyer's action on behalf of one client
    will materially limit the lawyer's effectiveness in
    representing another client in a different case: for
    example, when a decision favoring one client will
    create a precedent likely to seriously weaken the
    position taken on behalf of the other client.

Conn. R. Prof'l Conduct 1.7 cmt.

    The Restatement of The Law Governing Lawyers defines

conflicts of interests as involving "a substantial risk that the

13

lawyer's representation of the client would be materially and
adversely affected by the lawyer's . . . duties to another
current client."  Restatement (Third) of The Law Governing
Lawyers § 121 (2000).  It advises: "General antagonism between
clients does not necessarily mean that a lawyer would be engaged
in conflicted representations by representing the clients in
separate, unrelated matters."  Id. cmt. c.  Moreover, a conflict
is only prohibited where a lawyer's "activities materially and
adversely affect the lawyer's ability to represent a client
including such an effect on a client's reasonable expectation of
the lawyer's loyalty."  Id. cmt. d.

### B. Circumstances of Conflict and Duty of Loyalty

Relying on Rule 1.7(a)(1), GE argues that Hunton's
representation of Enzo is "directly adverse" to GE's interests in
that:

> (i) Hunton appeared adverse to GE during depositions in
> the New York action; (ii) Hunton has continued to
> actively collaborate with GE's opposing counsel to the
> detriment of GE; (iii) Hunton has generated work
> product that Enzo is seeking to use contemporaneously
> against GE; and (iv) Hunton has confirmed Enzo's intent
> to use Hunton's future work product and any favorable
> rulings that Hunton obtains from this Court to Enzo's
> advantage in the New York Action.

(GE Mot. at 11-12.)  Plaintiff argues in response that there is
no direct adversity and that the "scenario is, at best for GE, a
positional conflict" (Pls. Opp. Mem. at 17), and that "[t]he
bottom line, however, is that attorneys represent clients — not

14

legal positions or patents," <u>Telectronics Proprietary, Ltd. v.</u>
<u>Medtronic, Inc.</u>, 836 F.2d 1332, 1338 (Fed. Cir. 1988) (emphasis
in original).

 Hunton has represented GE Healthcare in <u>inter alia</u>
intellectual property matters since November 2001 (Schulman Aff.,
Pls. Ex. 3, ¶ 3), and even though GE announced its acquisition of
Amersham in October 2003 (GE Mot. at 3), Hunton nonetheless
entered an appearance in October 2003 as Enzo's counsel in
<u>Applera</u> (<u>see</u> Fedus Aff., Pls. Ex. 6, ¶ 3).  Hunton claims that it
"made clear to GE that it would have to communicate with the
Greenberg firm in order to, <u>e.g.</u>, deal with overlapping discovery
issues and maintain the consistency of the claim construction
positions advocated in the two cases."  (Pls. Opp. Mem. at 24.)
Horton claims that it was not until spring 2005 that he was
informed that Hunton would be representing Enzo, and that
although he was initially satisfied by representations of "a
strict ethical wall," he "would never have consented to Hunton's
assistance to Greenberg Traurig in the New York case or any
collaboration between the Hunton and Greenberg Traurig firms."
(Horton Aff., Pls. Reply Mem. Ex., ¶¶ 4, 9.)

 GE argues that it was not provided with timely, full
disclosure as to the extent of Hunton's engagement with
Greenberg, such as Perez's appearance at the Ward deposition and
the attempted sharing of the claim construction document.  While

15

Perez's "appearance" at the Ward deposition was inappropriate, it was at the deposition of the patent holder's inventor, not of any Amersham or GE witness.  Neither this nor the remainder of GE's record shows that the cooperation of Hunton and Greenberg has gone beyond that which is necessary "to assure that claim construction positions taken in Connecticut regarding the overlapping patents were consistent with positions taken in the New York Action," and nothing pertinent to Amersham's accused product or other alleged infringing conduct.  (Perez Aff., Pls. Ex. 4, ¶ 5.)

In Fund of Funds v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977), on which GE relies, plaintiff Fund of Funds had sued King Resources, Inc. and later brought a separate, related suit against Arthur Andersen, as King's accounting firm.  The Second Circuit granted Arthur Andersen's motion to disqualify law firm Milgrim Thomajan, counsel for plaintiff Fund of Funds in the Arthur Andersen case, where Milgrim Thomajan had collaborated with law firm Morgan Lewis, which represented Fund of Funds in the King case and represented Arthur Andersen in other matters. Specifically, a Morgan Lewis attorney aided Milgrim Thomajan in drafting Fund of Funds's complaint against King, Morgan Lewis and Milgrim Thomajan shared an expert in the two cases, and lawyers from both firms interviewed a witness with respect to both actions at the offices of Milgrim Thomajan, although they

16

questioned the witness separately.  See id. at 231-32.  The
Second Circuit held that "[i]n undertaking the background
investigation, and in segregating the papers which were, in part,
ultimately used against Andersen, Morgan Lewis was applying its
privileged knowledge with respect to Andersen."  Id. at 236.

In another case cited by GE, Freedom Wireless v. Boston
Communications Group, Inc., No. 2006-1020 (Fed. Cir. Mar. 20.
2006) (unpublished), the Federal Circuit disqualified the firm
Quinn Emanuel, counsel for the plaintiff, where plaintiff had
obtained an injunction that would apply against Nextel, one of
its other clients who was the defendant in a separate patent
infringement case.

The disqualifications of counsel in Freedom Wireless and
Fund of Funds do not counsel disqualification of Hunton in this
case.  While Perez's "appearance" at the Ward deposition and the
submission of the claim construction chart raise initial
superficial concern, "Hunton has never performed any substantive
legal work for GE Healthcare with respect to . . . the patents .
. . at issue in [Applera]" (Schulman Aff., Pls. Ex. 3, ¶ 5).
Moreover, GE's concern about the preclusive effect of rulings on
patent invalidity, see Allen Archery v. Browning Mfg. Co., 819
F.2d 1087, 1091 (Fed. Cir. 1987) (citing Miss. Chem. Corp. v.
Swift Agricultural Chems. Corp., 717 F.2d 1374, 1376 (Fed. Cir.
1983)), is not in play in this case in the context of the

17

conflicting claim constructions in this case and Amersham,
because there is no interlocutory appeal, and Hunton will not be
involved in any future appeal affecting Amersham's interests.
Simply put, while the construction of Enzo's patents applicable
to the infringement claims brought against two separate accused
infringers, Amersham and Applera, implicates pretrial Markman
overlap, the trials of how those constructions apply to the
respective accused products or conduct are wholly separate.  GE
has not claimed that any of its witnesses in Amersham will be
cross-examined by Hunton in Applera, as contemplated as
demonstrating direct adversity under Rule 1.7(a)(1).

    It is true that because "[a] lawyer's duty to his client is
that of a fiduciary or trustee," every client should have its
lawyer's "undivided loyalty as its advocate and champion."
Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384 (2d Cir. 1976).
However, GE takes too broad a view of this duty of loyalty in
seeking disqualification of Hunton.  The Court recognizes GE's
concern that Hunton will be making arguments on behalf of Enzo
with respect to patent validity that are contrary to the views of
Amersham, but this issue is one relating to the circumstances of
Enzo's patents and independent of the specific circumstances of
Amersham.  This situation has not been shown to constitute the
prohibited representation of opposing parties in litigation, or
implicating disclosures of attorney-client confidential

18

communications or knowledge.  <u>See</u>, <u>e.g.</u>, <u>Freedom Wireless</u>, No. 2006-1020 (Fed. Cir.).  Disqualification is thus not warranted under Conn. R. Prof'l Conduct 1.7.

A balancing of Enzo's, GE's, and the public's interests under <u>Hull v. Celanese Corp.</u>, 513 F.2d 568, 570 (2d Cir. 1975), confirms the appropriateness of denying the disqualification motion.  The Court's denial of disqualification reflects some concern about prejudicing Enzo at this late stage in the litigation, even though the Court recognizes that Enzo is a sophisticated corporate conglomerate with in-house legal counsel and the ability to obtain replacement counsel, albeit at significant duplication of cost.  General Electric's interest in preserving the duty of loyalty owed to it by Hunton is not compromised by the Court's decision: Hunton never represented GE in relation to its recently acquired entity Amersham and does not appear on behalf of its opponents in <u>Amersham</u>, and there is no evidence that Hunton has assisted Greenberg in representing Enzo beyond ensuring consistency in <u>Markman</u> issues.  Finally, as this case has been before the Court since June 2004, disqualification would be imprudent in terms of the public's interest in efficient case management and utilization of judicial resources.

The balance tips toward denial of the disqualification motion, as GE has not met its heavy burden of showing the necessity of disqualifying Hunton from continued representation

19

of Enzo in a case in which GE is not a party, and where Hunton's clients are adverse to each other only insofar as they take opposite positions on a common legal issue in different cases pending in separate trial courts.

## IV. Conclusion and Order

General Electric's Motion to Disqualify Plaintiff's Counsel [Doc. #121] is DENIED.  In order to insure that Hunton's continued representation of Enzo in this case does not involve future activities which could result in a concurrent conflict of interest, the Court will enter the following Order which is to govern this case through conclusion, unless otherwise modified by the Court:

(1) Hunton will not assist Greenberg in any manner in the suit brought by plaintiffs in the New York action with respect to any legal, evidentiary, or other substantive issue in that case, including drafting briefs, motions, or other papers on behalf of plaintiffs for the purpose of submission in the New York action; commenting on, editing, revising, or suggesting briefs, motions, or other papers to Greenberg for purposes of the New York action; and providing legal or substantive advice to Greenberg for any purpose of the New York action;

(2) Hunton shall not prepare witnesses (including expert witnesses) for or attend depositions or hearings in the New York action;

(3) Hunton will not represent plaintiffs in any appellate proceedings that might result from this action or any appellate proceeding that would require Hunton to advance arguments inconsistent with any positions that have been, or may be, advanced by GE in the New York action; and

(4) Hunton shall provide Greenberg with a copy of this Order immediately.

IT IS SO ORDERED.

/s/

_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 5th day of January, 2007.**