**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ENZO BIOCHEM, INC., ENZO LIFE SCIENCES, INC., AND YALE UNIVERSITY, | ) ) ) | |
| | ) | |
| PLAINTIFFS, | ) | CIVIL ACTION NO.  3-04-CV-929 (JBA) |
| | ) | |
| V. | ) | |
| | ) | |
| APPLERA CORP. AND TROPIX, INC., | ) ) | |
| | ) | |
| DEFENDANTS. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION**
**TO APPLERA'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**
**OF THE WARD PATENTS**

**Table of Contents**

I.      INTRODUCTION ...............................................................................................1

II.     STATEMENT OF CONTROVERTED FACTS ...................................................1

III.    LEGAL PRINCIPLES RELEVANT TO THIS MOTION....................................1

     A.    Standard for Summary Judgment.............................................................1

     B.    Patent Law Principles ................................................................................3

          1.    A United States Patent Is Presumed Valid....................................3

IV.    ARGUMENT ......................................................................................................3

     A.    The Asserted Claims Of The '767 And The '824 Patents Satisfy The Written Description Requirement.............................................................4

          1.    The Law of Written Description. .................................................4

          2.    The Ward Specification Discloses Direct Detection. .................6

          3.    The Court Has Held That The "Patents Cover Both Direct and Indirect Detection.".................................................................8

          4.    Applera's Characterization Of The Ward Prosecution History Is Disingenuous....................................................................10

     B.    The "Not Substantially Interfering" Limitation Is Definite...................12

          1.    The Law Of Indefiniteness.........................................................12

          2.    Applera's Argument Is Legally Without Merit. .........................14

     C.    The Asserted Claims Of The '767, '824 And The '928 Patents Are Novel Over References Cited by Applera.......................................................16

          1.    The Law of Anticipation.............................................................17

          2.    Kasai Fails To Anticipate The Asserted Claims Of The '767 And '824 Patents.......................................................................18

          3.    Pingoud Fails To Anticipate The Asserted Claims Of The '767 And '928 Patents.............................................................23

          4.    The Bauman Dissertation Fails To Anticipate The Claims Of The '824, '767 And '928 Patents. ...........................................26

V.     CONCLUSION..................................................................................................29

## Table of Authorities

**Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)................................................................................. 2

*Aero Products Intern., Inc. v. Intex Recreation Corp.*,
  466 F.3d 1000 (Fed. Cir. 2006)............................................... 12, 15, 16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................. 2

*Andrew Corp. v. Gabriel Electronics, Inc.*,
  847 F.2d 819 (Fed. Cir. 1988)........................................................ 13, 14

*Barbed Wire Patent*, 143 U.S. 275, 287-288 (U.S. 1892) ......................... 3

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.*,
  338 F.3d 1368 (Fed. Cir. 2003)...................................................... 13, 15

*Bristol-Myers Squibb Co. v. Ben Venue Labs. Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001)............................................................ 18

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005)............................................................. 5

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*,
  145 F.3d 1303 ............................................................................... 1, 17

*Colorado v. New Mexico*,
  467 U.S. 310 (1984)................................................................................. 2

*Continental Can Co. USA Inc. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991)......................................................... 2, 3

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)................................................ 12, 13, 15, 16

*Design Innovation, Inc., v. Fisher-Price, Inc.*,
  463 F. Supp. 2d 177 (J. Arterton, 2006) ........................................... 10

*Energizer Holdings, Inc. v. International Trade Com'n*,
  435 F.3d 1366 (Fed. Cir. 2006)............................................... 12, 15, 16

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
  296 F.3d 1316 (Fed. Cir. 2002)....................................................... 1, 5

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001)..................................................................... 13

*Falko-Gunter Falkner v. Inglis,*
    448 F.3d 1357 (Fed. Cir. 2006)....................................................................... 6

*Helifix Ltd. v. Blok-Lok, Ltd.,*
    208 F.3d 1339 (Fed. Cir. 2000)................................................... 18, 23, 25, 28

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n,*
    341 F.3d 1332 (Fed. Cir. 2003)..................................................................... 12

*Intel Corp. v. International Trade Commission,*
    946 F.2d 821 (Fed. Cir. 1991)......................................................................... 2

*Invitrogen Corp. v. Biocrest Mfg.,*
    424 F.3d 1374 (Fed. Cir. 2005)................................................... 12, 13, 15, 16

*LizardTech, Inc. v. Earth Resource Mapping, PTY, Inc.,*
    424 F.3d 1336 (Fed. Cir. 2005)................................................................... 6, 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)........................................................................................ 2

*Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1471 (Fed. Cir. 1997) ..................... 18

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
    806 F.2d 1565 (Fed. Cir. 1986)................................................................ 13, 15

*Personalized Media Communications, LLC v. ITC,*
    161 F.3d 696 (Fed. Cir. 1998)....................................................................... 12

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)................................................................ 21, 22

*Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1236 (Fed. Cir. 1989) .................................... 18

*Rockwell Int'l Corp. v. United States,*
    147 F.3d 1358 (Fed. Cir. 1998).............................................................. 2, 17, 18

*Rodriguez v. City of New York,*
    72 F.3d 1051 (2nd Cir. 1995)........................................................................... 2

*Scripps Clinic & Research Found. v. Genentech, Inc.,*
    927 F.2d 1565 (Fed. Cir. 1991)................................................................... 2, 18

*Seattle Box Co. v. Industrial Crating & Packing, Inc.,*
    731 F.2d 818 (Fed. Cir. 1984)............................................................. 13, 14, 15

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005)..................................................................... 13, 15, 16

*Transmatic Inc. v. Gulton Indus., Inc.*,
    53 F.3d 1270 (Fed. Cir. 1995)............................................................................... 1

*Union Oil Co. v. Atlantic Richfield Co.*,
    208 F.3d 989 (Fed. Cir. 2000).............................................................................. 3

*Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987)................ 18

## Statutes

35 U.S.C. § 282........................................................................................................ 3

Fed. R. Civ. P. 56(c) ................................................................................................ 1

Rule 56(a)(2) ............................................................................................................ 1

## Rules

Bauman, J.G.J., "Cytochemical Detection of Specific Nucleic Acid Sequences
    Development and Application of In Situ Hybridisation Methods for Fluorescence
    Microscopy," (publ. Drukkerji J. H. Pasmans b.v. 's-Gravenhage, Netherlands
    (1980)...................................................................................................... 17

Kasai, H. *et al.*, "Specific Fluorescent Labeling of 7-(aminomethyl)-7-deazaguanosine
    Located in Anticodon of tRNA[Tyr] Isolated from *E. Coli* Mutant," *Nucleic Acids
    Res.,* Vol. 7, No. 1, pp. 231-38 (1979) ............................................................... 17

Pingoud A. *et al.,* "Fluresceinylthiocarbamyl-tRNA[Tyr]: a Useful Derivative of tRNA[Tyr]
    (E.coli) for Physiochemical Studies," *Nucleic Acids Res.,* Vol. 4, No. 2, pp. 327-
    38 (1977)...................................................................................................... 17

## I.      INTRODUCTION

Plaintiffs Enzo Biochem, Inc., Enzo Life Sciences, Inc., and Yale University (hereinafter "Plaintiffs") respectfully submit this memorandum in opposition to Defendant Applera Corp.'s (hereinafter "Applera") summary judgment motion that the claims of the Ward Patents are invalid.[1]  Plaintiffs dispute virtually all of the purportedly "undisputed" facts proffered by Applera, and have demonstrated that Applera cannot prevail on this defense as a matter of law. *See* Plaintiffs' Local Rule 56(a)(2) Statement.

## II.      STATEMENT OF CONTROVERTED FACTS

Pursuant to Local Rule 56(a)(2), Plaintiffs' have separately submitted herewith its Statement of Disputed Facts in Opposition to Applera's motion.

## III.      LEGAL PRINCIPLES RELEVANT TO THIS MOTION

### A.      Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent" — in this case, Plaintiffs.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1307 (citing *Transmatic Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274 (Fed. Cir. 1995)).

An accused infringer bears a particularly heavy burden in seeking to invalidate on summary judgment a presumptively valid United States patent.  In a patent case as in any other,

---

[1] The Ward Patents 5,467,928 ("the '928 Patent"), 5,449,767 ("the '767 Patent"), and 5,328,824 ("the '824 Patent").  Plaintiffs are asserting claims 1, 2, 8, 11, 13, 42, 46, 47, 48, 49, 50, 51, 67, 68, and 70 of the '767 Patent; claims 1, 18, 19, 21, 25, 28, 32, and 33 of the '824 patent; and clams 1 and 2 of the '928 Patent.

an issue may be determined on a motion for summary judgment when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed. Cir. 1991). The movant's burden is to show that no fact material to the issue is in dispute, and that even if all material factual inferences are drawn in favor of the non-movant, the movant is entitled to judgment as a matter of law. *Id*.

In rendering a decision on a motion for summary judgment, a court must view the evidence presented through the prism of the substantive evidentiary burden that would inhere at trial. *Anderson*, 477 U.S. at 254; *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998). Therefore, summary judgment of patent invalidity must be predicated upon facts established ***by clear and convincing evidence***. *Rockwell*, 147 F.3d at 1362. (emphasis added). Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact "***an abiding conviction that the truth of [the] factual contentions are 'highly probable***.'" *Intel Corp. v. International Trade Commission*, 946 F.2d 821, 829-30 (Fed. Cir. 1991) (emphasis added) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). Indeed, a party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-1061 (2nd Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

The purpose of the summary judgment process is to avoid a clearly unnecessary trial. *Continental Can Co. USA Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) But it is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial. *Continental Can* 948 F.2d at 1265. While

- 2 -

facilitating the disposition of legally meritless suits, when summary judgment is improvidently granted, the effect is to prolong litigation and increase its burdens. *Id*. at 1265-1266.

In this case, Applera has failed to meet its burden. Many of the alleged "facts" Applera relies on in support of its motion are both uncorroborated[2] and strongly disputed.[3]

### B.    Patent Law Principles

#### 1.    A United States Patent Is Presumed Valid.

Under the United States patent laws, a patent is presumed valid. 35 U.S.C. § 282. Moreover, each claim of a patent is presumed valid independently of the validity of other claims. *Id*. This means that each patent is entitled to the presumption that the claimed inventions are both novel and non-obvious over the prior art and meet the statutory requirements under 35 U.S.C. § 112. The burden of establishing invalidity of a patent, or any claim thereof, rests on the party asserting such invalidity and such party must present clear and convincing evidence establishing facts that lead to the legal conclusion of invalidity. *See id.*; *see also Union Oil Co. v. Atlantic Richfield Co.*, 208 F.3d 989, 994-95 (Fed. Cir. 2000).

## IV.    ARGUMENT

Applera charges that the Ward Patents are invalid for failing to satisfy the written description and definiteness requirements of 35 U.S.C. § 112, and as anticipated under 35 U.S.C. § 102. *See* Applera's SJ Brief at 1. None of these charges has any merit. Applera's section 112

---

[2] The Supreme Court requires that testimonial evidence in support of a claim of patent invalidity must have sufficient corroboration. The *Barbed Wire Patent*, 143 U.S. 275, 287-288 (U.S. 1892) (twenty-four witnesses, all uninterested in the case, testified that they had seen the patented fence exhibited by a third party two years prior to the filing of the patent, yet the testimony was not sufficient to corroborate allegedly invalidating prior art.)

[3] Applera's assertion that its motion presents undisputed facts is false. This assertion is all the more disingenuous given that Applera only provided meaningful invalidity contentions with respect to Bauman and Pingoud on February 16, 2007, notwithstanding Plaintiffs' repeated requests for this information.

argument — that the claims lack adequate written support for direct detection — is simply a reiteration of the argument it first raised during the claim construction phase of this case, and which this Court expressly rejected in its Claim Construction Ruling.  Dissatisfied with that Ruling, Applera now invites the Court to revisit those same issues.  The Court should decline the invitation.

Applera's other section 112 argument — that the claim term "not substantially interfering" is fatally indefinite — is nothing short of a "Hail Mary" pass designed to invalidate the Ward Patents in one fell swoop by equating words of approximation with indefiniteness.  This has never been the test for indefiniteness and, in fact, has been expressly rejected by the Federal Circuit.  The actual test for indefiniteness is whether the claim term is "insolubly ambiguous" such that a proper construction cannot be adopted.  In this case, the Court has already construed the term "not substantially interfering," and thus it is not insolubly ambiguous, *i.e.*, indefinite.

Applera's section 102 argument — that the claims of the Ward Patents are anticipated by three separate prior art references — also fails.  As an initials matter, there is a genuine issue of material fact regarding whether these references are even enabling, as required in order to anticipate the asserted claims.  Moreover, even assuming they are enabling, neither reference discloses "each and  every element" of the asserted claims as construed by the Court.  As such, there can be no anticipation.[4]

**A.**   **The Asserted Claims Of The '767 And The '824 Patents Satisfy The Written Description Requirement.**

**1.**   **The Law of Written Description.**

---

[4] The Court should also take note that Applera has elected to stand on the attorney-client privilege and refused to turn over any opinion of counsel relating to the alleged invalidity of the Ward Patents.

The required content of the patent specification is set forth in the Patent Act:

> The specification shall contain a **written description of the invention**, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112(1) (emphasis added). The "written description" requirement implements the principle that a patent must describe the technology that is sought to be patented. *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005). The requirement serves both to satisfy the inventor's obligation to disclose the technological knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is claimed. *Id.*; *see also Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 959 (Fed. Cir. 2002) (the written description requirement "is the quid pro quo of the patent system; the public must receive meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time"). The written description requirement thus satisfies the policy premises of the law, whereby the inventor's scientific contribution is added to the body of knowledge in exchange for the grant of patent exclusivity. *Capon*, 418 F.3d at 1357.

The descriptive text needed to meet these requirements varies with the nature and scope of the invention at issue, and with the scientific and technological knowledge already in existence. *Id.* The law must be applied to each invention that enters the patent process, for each patented advance is novel in relation to the state of the science. *Id.* Since the law is applied to each invention in view of the state of relevant knowledge, its application will vary with differences in the state of knowledge in the field and differences in the predictability of the science. *Id.*

A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006) (citing *LizardTech, Inc. v. Earth Resource Mapping, PTY, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005)). That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. *Id.* Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation. *Id.*

## 2. The Ward Specification Discloses Direct Detection.

As explained above, a patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. *LizardTech*, 424 F.3d at 1345. In this case, it is undisputed that single-component signalling systems, such as fluorescent dyes, were known at the time the original Ward specification was filed. *See, e.g.*, Perez Decl. Ex. 2 at 46:8-13 (Tr. Markman Hearing). It was thus unnecessary for the patentee to spell out every detail of these systems in the specification. *LizardTech*, 424 F.3d at 1345. Rather, the patentee need only have conveyed to a person of skill in the art that the patentee ***possessed*** the claimed invention — labeled nucleotides suitable for incorporation into polynucleotides — and ***enabled*** such a person to make and use the full scope of the invention without undue experimentation. *Id.*

The Federal Circuit has held that the "possession" and "enablement" requirements of section 112 "usually rise and fall together. That is, a recitation of how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the

inventor possesses the full scope of the invention, and vice versa." *Id*. at 1345. In this case, the

Ward specification satisfies both requirements. As Dr. Sinden and Dr. Sherman have each

testified, a person of skill in the art would understand that the specification teaches how to make

nucleotides labeled with single-component signalling systems (*e.g.*, fluorescent dyes). *See* Perez

Decl. Ex. 3 at 10-22 (Supplemental Sinden Report); *see also* Sherman Decl. at ¶ 109. Indeed, it

is undisputed that the Ward specification enables persons skilled in the art to make and use such

nucleotides. In fact, Applera in its ***own patents*** cites specifically to the Ward specification as

describing the procedure for labeling nucleotides with fluorescent dyes:

> Preferably, the dyes are covalently linked to the 5-carbon of
> pyrimidine bases and to the 7-carbon of 7-deazapurine bases.
> Several suitable base labeling procedures have been reported that
> can be used with the invention, *e.g.* … U.S. Pat. Nos. … ***5,449,767***
> … which is incorporated herein by reference.

Perez Decl. Ex. 16 at 28:25-36. (U.S. Pat. No. 5,863,727) Thus, to ensure that its own patents

had adequate enabling disclosure, Applera incorporated by reference the teaching of the '767

Patent.

It is thus clear that the Ward specification enables one of skill in the art to make and use

nucleotides labeled with single-component fluorescent dyes, *i.e*, "directly detectable"

nucleotides. That in of itself  is probably sufficient to demonstrate that the patentee "possessed"

the full scope of the claimed invention. *See LizardTech*, 424 F.3d at 1345 ("a recitation of how

to make and use the invention across the full breadth of the claim is ordinarily sufficient to

demonstrate that the inventor possesses the full scope of the invention").

But the evidence of record also demonstrates that the Ward specification ***expressly***

***teaches*** direct detection. Dr. Sinden, for example, testified that examples 7, 8 and 9 in the

specification discloses direct detection. *See, e.g.*, Perez Decl. Ex. 2 at 46:8-55:1; 73:19-76:3 (Tr.

Markman Hearing); *see also* Perez Decl. Ex. 1 at 6 (Claim Construction Ruling) ("Additionally,

plaintiff's expert, Dr. Richard R. Sinden, testified at the Markman hearing that the specification includes an example of direct detection.").  Moreover, Dr. Sherman agrees that the specification teaches direct detection: "I find written support in the specification for direct detection … Further, I believe the Ward Patent specification taken as a whole reasonably conveys to a person of ordinary skill in the art the subject matter of the claimed inventions, particularly in view of the detailed chemical syntheses and examples."  *See, e.g.*, Sherman Decl. at ¶ 109.

Accordingly, both Dr. Sinden and Dr. Sherman ━ each undisputably skilled in the relevant art ━ have provided sworn testimony that the Ward specification expressly teaches direct detection.  In the face of all this, Applera relies solely on attorney argument and purported discrepancies between Dr. Sinden's deposition testimony and *Markman* testimony to argue that the Ward specification does not disclose direct detection.  This falls far short of meeting its burden of demonstrating that there are no genuine issues of material fact in dispute.

> **3.    The Court Has Held That The "Patents Cover Both Direct and Indirect Detection."**

Applera contends that the asserted claims of the Ward Patents are invalid for failing to satisfy the written description requirement.  *See* Applera's SJ Brief at 2-17.  Specifically, Applera charges that the Ward specification only discloses indirect detection and provides no support for direct detection.  *See id*. at 8-12.  Moreover, Applera argues that the prosecution history suggests that the United States Patent and Trademark Office understood the specification to be limited to direct detection and that Enzo repeatedly represented it to be such.  *See id*. at 12-17.

If all of this sounds familiar, that's because it is.  These are precisely the same arguments that Applera presented to the Court during the claim construction phase of this case.  *See* Perez

Decl. Ex. 18 at 13-21 (Defendants' Opening Claim Construction Brief).[5]  The Court summarized

Applera's arguments in its Claim Construction Ruling:

> Defendants argue that because this specification does not teach a directly detectable moiety, Claim 1 must not do so.  Defendants also argue that because the specification states that A is "formed," A must have multiple components and cannot itself be the directly detectable complex.  Additionally, they rely on competing dictionary definitions that differ from plaintiffs', as well as that the six articulated "essential criteria" for A listed in the specifications, which, they argue, require that, among other properties, A be able to "react specifically with chemical or biological reagents to provide a sensitive detection system, and that the "detection system" be able to react with A, suggesting that A itself is not directly detectable.

Perez Decl. Ex. 1 at 7 (Claim Construction Ruling) (internal citations omitted).  Having thus

summed up Applera's argument, and having duly considered the argument and all the evidenced

Applera cited in support of it, the Court unequivocally rejected it: "The Court finds that the plain

language and structure of both the '824 and '767 Patents indicate that *these patents cover both

direct and indirect detection*."  *Id.* (emphasis added).

In so holding, the Court relied on the understanding of one skilled in the relevant art.

Specifically, the Court cited to the testimony of Plaintiffs' technical expert, Dr. Sinden, who

testified at the claim construction hearing that the specification includes an example of direct

detection, namely Example 9.  Perez Decl. Ex. 1 at 6 (Claim Construction Ruling).  Nonetheless,

Applera now seeks to challenge Dr. Sinden's assertions by suggesting that his analysis was

concocted at "the eleventh-hour" and that it flatly contradicts both the specification and witness

---

[5] Applera argued in its claim construction brief that "the entire purpose of the Ward patents is to teach indirect detection methods, and Enzo's attempts to construe the Ward patents to cover directly labeled nucleotides is contrary to the fundamental nature of the alleged invention."  *See id.* at 14.  It presents the same argument now.

testimony.  *See* Applera's SJ Brief at 2-12.  These assertions have no merit and, in fact, are completely irrelevant in view of the Court's claim construction ruling.

These issues were fully briefed and argued at the claim construction hearing.  Dr. Sinden explained on direct examination why in his opinion Example 9 describes direct detection.  Perez Decl. Ex. 2 at 46:8-55:1; 73:19-76:3 (Tr. Markman Hearing).  Applera had the opportunity to cross-examine him on that issue, and did just that, devoting nearly all of its time on cross-examination to the issue of whether Example 9 describes direct detection.  *See id*. at 58:3-73:15.  The Court heard this testimony, weighed the evidence, assessed Dr. Sinden's credibility, and ultimately held that the specification did support claims covering direct detection.  Perez Decl. Ex. 1 at 5-9 (Claim Construction Ruling).  That holding is thus "law of the case," and should not be revisited absent a compelling justification, which Applera has not put forward.  *See Design Innovation, Inc., v. Fisher-Price, Inc.*, 463 F. Supp. 2d 177, 180 (J. Arterton, 2006) ("The doctrine of law of the case posits that when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case.  … Rulings of the district court are subject to revision by that court at any time before the entry of final judgment.  The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal quotations and citations omitted).

### 4.    Applera's Characterization Of The Ward Prosecution History Is Disingenuous.

Applera also argues that the prosecution history of the Ward Patents "palpably demonstrate not only that the inventors did not invent and thus did not possess any direct detection system, but that Enzo obtained the claims in the '824 and '767 patents by representing to the U.S. Patent and Trademark Office ("PTO") that its claims were not so broad."  Applera's SJ Brief at 12.  Applera's insinuation that Plaintiffs somehow duped the PTO into issuing claims

covering direct detection is absurd.  A patent is presumed valid, in part, because the PTO is presumed to have done their job.  No amount of selective quoting from the prosecution histories of the Ward Patents can alter the fact that the PTO ultimately found that the '767 and '824 Patent claims satisfied the written description requirement.

Furthermore, Applera's suggestion that the PTO "understood the [Ward] specification to be limited to indirect detection" is astonishing given that it is belied by ***Applera's own conduct*** in this case.  Specifically, in 1995, Plaintiffs transmitted to Applera — under confidentiality — a copy of a recently allowed claim from a pending patent application that ultimately issued as the '767 Patent.  *See* Perez Decl. Ex. 19 (Facsimile to Steve Macevicz from Ronald Fedus).  Without Enzo's permission or knowledge, representatives from Applera met with the Assistant Commissioner of Patents at the PTO to complain about the scope of Plaintiffs' claim and to ask that the PTO withdraw allowance of the application.  *See* Perez Decl. Ex. 20 at GT008335-36 (Letter to Hon. Lawrence J. Goffney, Jr., Assistant Commissioner of Patents from Stephen C. Macevicz).  In a follow-up letter, Applera's Senior Patent Counsel, summed up Applera's objections to Plaintiffs' claim:

> ***This claim covers fluorescently labeled DNA sequencing fragments*** … a key component in all presently and foreseeably available automated DNA sequencing procedures and instruments — that is, a fundamental technology upon which all genome sequencing projects rely. …  The only rationale for this claim is to obtain a claim that ***literally covers DNA sequencing fragments*** …

*Id*.

Thus there can be no dispute that the PTO was very well aware that the claims of the '767 Patent claims covered direct detection.[6]  Applera made quite sure it.  It's suggestion now that

---

[6] As for the claim that Applera admitted "literally covers DNA sequencing fragments," it is ***identical*** in every respect to claim 1 of the '767 patent.

somehow the PTO was misled into issuing those claims, or did not understand the scope of the claims, is thus disingenuous in the extreme.

**B.      The "Not Substantially Interfering" Limitation Is Definite.**

**1.      The Law Of Indefiniteness.**

It is axiomatic that a patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 (2000).  "Because the claims perform the fundamental function of delineating the scope of the invention, the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); *see also Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003).  The test for definiteness is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Invitrogen Corp. v. Biocrest Mfg.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005) (citing *Personalized Media Communications, LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998)).

Conversely, the test for indefiniteness is whether "reasonable efforts at claim construction prove futile, that is, if a claim is insolubly ambiguous, and no narrowing construction can properly be adopted." *Id.* (citations omitted); *see also Energizer Holdings, Inc. v. International Trade Com'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) ("A claim that is amenable to construction is not invalid on the ground of indefiniteness."); *Aero Products Intern., Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006) ("If a claim is not amenable to construction, the claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2. … Because, as just seen, claim 12 is capable of being construed, it is not indefinite."); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d

1331, 1340 (Fed. Cir. 2005) ("[C]laims need not be plain on their face in order to avoid condemnation for indefiniteness; rather, what [this court has] asked is that the claims be amenable to construction, however difficult that task may be."); *Datamize*, 417 F.3d at 1347 (The definiteness requirement "does not compel absolute clarity.  Only claims not amenable to construction or insolubly ambiguous are indefinite.").  Thus, "even if it is a formidable task to understand a claim, and the result not unanimously accepted, as long as the boundaries of a claim may be understood it is sufficiently clear to avoid invalidity for indefiniteness."[7] *Invitrogen*, 424 F.3d at 1383 (citations omitted); *see also Datamize*, 417 F.3d at 1347.

Furthermore, it is well established that words of degree do not render a claim term indefinite.  Terms such as "substantially equal," "about", and "closely approximate" are ubiquitous in patent claims.  *See Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) and cases cited therein.  Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the art have been accepted in patent examination and upheld by the courts.  *See, e.g.*, *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372-73 (Fed. Cir. 2003) (claim term "about" held to be definite); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1380-81 (Fed. Cir. 2001) (claim term "substantial absence" held to be definite); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575-1576 (Fed. Cir. 1986) (claim term "so dimensioned" held to be definite); *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984) (claim term "substantially equal to" held to be definite); *but see Datamize*, 417 F.3d at 1351-53 (claim term "aesthetically pleasing" held purely subjective and thus indefinite).

---

[7] In this regard it is important to note that an issued patent is entitled to a statutory presumption of validity and the Federal Circuit requires that clear and convincing evidence be shown to invalidate a patent.  *Datamize*, 417 F.3d at 1347 (citations omitted).

## 2.    Applera's Argument Is Legally Without Merit.

Applera asserts that the claim term "not substantially interfering" is fatally indefinite. Applera's SJ Brief at 18-22.  Applera is mistaken for at least two reasons.  First, as explained above, words of degree do not render a claim term indefinite.  The claim term "substantially interfere" is a term of degree and "its acceptability depends on whether one of ordinary skill in the art would understand what is claimed in light of the specification, even if experimentation may be needed."  *Andrew Corp.*, 847 F.2d at 821 (citing *Seattle Box Co.*, 731 F.2d at 826).  In this case, Plaintiffs' technical experts, Dr. Sinden and Dr. Sherman, have both opined that they would have understood the term "substantial interference" in light of the specification.[8, 9]  Perez Decl. Ex. 17 at 29-30 (Sinden Expert Report); Perez Decl. Ex. 11 at 134:23-140:11 (Sinden Depo. Tr.); Sherman Decl. at ¶¶ 112-116.

Applera, on the other hand, has not cited to any expert testimony in its Brief rebutting Plaintiffs' experts.  In fact, it relies ***entirely on attorney argument*** to rebut Dr. Sinden's and Dr. Sherman's testimony, even though the test for adequacy is whether ***one skilled in the art*** would

---

[8] Applera suggests that Dr. Sinden's understanding of "substantially interfere" does not agree with Dr. Sherman's understanding.  *See* Applera's SJ Brief at 21.  This is simply not the case.  Dr. Sinden testified that this determination would be "in the hands of the experimenter" and that if the experimenter were able to get a signal and publish a paper, that would be enough. *See* Perez Decl. Ex. 11 at 139 (Sinden Depo. Tr.).  Dr. Sherman stated that a linkage group must provide sufficient rigidity in order to prevent substantial interference with hybridization.  Perez Decl. Ex. 21 at ¶ 44 (Sherman Rebuttal Report).  These statements are perfectly consistent.  In *designing* a polynucleotide probe, it is important to ensure that the linkage group is sufficiently rigid so as to prevent substantial interference with hybridization.  In *testing* whether that linkage group prevents substantial interference with detection of the signal, the experimenter must assess the relative strength or weakness of the signal.

[9] Applera does not dispute that Dr. Sherman or Dr. Sinden are both persons skilled in the relevant art.

understand the claim term when read in view of the specification.[10] *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986); *Seattle Box Co.*, 731 F.2d at 826.  At the very least, Applera has thus failed to establish that no genuine issue exists as to the meaning of this claim term.

Second, Applera's indefiniteness argument is simply too little, too late.  As explained above, the test for indefiniteness is whether "reasonable efforts at claim construction prove futile." *Invitrogen*, 424 F.3d at 1383.  "A claim that is amenable to construction is not invalid on the ground of indefiniteness." *Energizer Holdings*, 435 F.3d at 1371; *see also Aero Products Intern.*, 466 F.3d at 1016 ("If a claim is not amenable to construction, the claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2. … Because, as just seen, claim 12 is capable of being construed, it is not indefinite."); *SmithKline Beecham Corp.*, 403 F.3d at 1340 ("[C]laims need not be plain on their face in order to avoid condemnation for indefiniteness; rather, what [this court has] asked is that the claims be amenable to construction, however difficult that task may be."); *Datamize*, 417 F.3d at 1347 ("Only claims not amenable to construction or insolubly ambiguous are indefinite."); *BJ Services Co. v. Halliburton Energy Services, Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("Indefiniteness is also a legal determination arising out of the court's performance of its duty construing the claims.").

In this case, the Court has already construed the disputed claim term.  Finding that the "more likely, and more persuasive, root fort the claim term 'not interfering substantially' is the

---

[10] Nor did Applera offer any expert testimony on this issue during claim construction. *See* Perez Decl. Ex. 1 at 12 (Claim Construction Ruling) ("Defendants offered no expert testimony commenting on this term ["substantially interfering"] or rebutting plaintiffs' expert testimony, and the language from the specification concerning melting points appears to be taken out of context and not relevant to the claims in question.")

detailed description that the detection uses a 'linker arm' between A and B to allow for

hybridization," the Court ruled:

> Thus, the claim language should be construed to account for the
> function of the linker arm.  As plaintiffs request, the terms "not
> interfering substantially with" and "that does not substantially
> interfere with" detection of A will be construed to mean that "the
> linkage group neither substantially interferes with the ability of the
> compound to hybridize with the nucleic acid nor substantially
> interferes with the ability of A to be detected."  Nothing in this
> specification or preferred embodiments supports the narrower
> construction urged by the defendants.

*See* Perez Decl. Ex. 1 at 13 (Claim Construction Ruling).  In arriving at this construction, the

Court evaluated the claims, the specification, and the unrebuttted testimony of Dr. Sinden, who

testified that a person of skill in the art at the time the application was filed would have

understood how to measure "substantial interference."  *See id.* at 11-13.

Applera's insistence now that the claim term "not substantially interfering" is indefinite

simply cannot be squared with the fact that the Court has already construed the term.  If the

claim term was fatally defective, it would have been "insolubly ambiguous" and thus

unamenable to claim construction.  The fact that the Court has construed the claim term confirms

that it is, in fact, amenable to claim construction, and thus ***necessarily definite***.  *See e.g.*,

*Invitrogen*, 424 F.3d at 1383; *Energizer Holdings*, 435 F.3d at 1371; *Aero Products Intern.*, 466

F.3d at 1016; *SmithKline Beecham Corp.*, 403 F.3d at 1340; *Datamize*, 417 F.3d at 1347.  At the

very least, Applera has not demonstrated that the claim term is indefinite as a matter of law.

**C.      The Asserted Claims Of The '767, '824 And The '928 Patents Are Novel
         Over References Cited by Applera.**

Applera cites three allegedly anticipatory references against the Ward Patents: Kasai,[11] Pingoud,[12] and Bauman.[13]  But as explained below, none of these three references discloses "each and every element" of the asserted claims as construed by the Court.  Moreover, there is a genuine issue regarding the sufficiency of the cited references' disclosure for anticipation purposes.  Applera's brief and supporting declarations, for example, do not address the testimony of Plaintiffs' expert, Dr. Sherman, regarding the references' lack of enabling disclosure.  At the very least, when the evidence is viewed in the light most favorable to Plaintiffs and all doubts resolved in favor of Plaintiffs, Applera has not met its burden of establishing that there is no genuine issue of material fact.  *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1307.

### 1.    The Law of Anticipation.

The issue of anticipation is a ***question of fact***.  *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1363 (Fed. Cir. 1998) (emphasis added).  To anticipate a patent, a prior art reference must be "***enabling***" and must describe the claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.  *Id*. at 1365 ("The prior art must be enabling."); *see also Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1471

---

[11] Perez Decl. Ex. 13 (Kasai, H. *et al.,* "Specific Fluorescent Labeling of 7-(aminomethyl)-7-deazaguanosine Located in Anticodon of tRNA[Tyr] Isolated from *E. Coli* Mutant," *Nucleic Acids Res.,* Vol. 7, No. 1, pp. 231-38 (1979) ("Kasai")).

[12] Perez Decl. Ex. 14 (Pingoud A. *et al.,* "Fluoresceinylthiocarbamyl-tRNA[Tyr]: a Useful Derivative of tRNA[Tyr] (E.coli) for Physiochemical Studies," *Nucleic Acids Res.,* Vol. 4, No. 2, pp. 327-38 (1977) ("Pingoud")).

[13] Perez Decl. Ex. 15 (The doctoral dissertation of J.G.J. Bauman titled "Cytochemical Detection of Specific Nucleic Acid Sequences Development and Application of In Situ Hybridisation Methods for Fluorescence Microscopy," (publ. Drukkerji J. H. Pasmans b.v. 's-Gravenhage, Netherlands (1980)) (the "Bauman Thesis")).

(Fed. Cir. 1997) ("In order to render a claimed apparatus or method obvious, the prior art must enable one skilled in the art to make and use the apparatus or method.").

Moreover, an anticipatory reference must disclose "**each and every limitation** … either expressly or inherently." *Id.* at 1363 (emphasis added); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs. Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001) (en banc) (emphasis added); *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) ("A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."). There must be **no difference** between the claimed invention and the alleged anticipatory reference as viewed by a person of ordinary skill in the field of the invention. *See Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991); *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) ("The identical invention must be shown in as complete detail as is contained in the ... claim.").

If there is a genuine issue of material fact relevant to any one of the above factors, summary judgment for the defendant is improper. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1345 (Fed. Cir. 2000).

> **2.     Kasai Fails To Anticipate The Asserted Claims Of The '767 And '824 Patents.**

Applera asserts that Kasai anticipates several of the asserted claims of the '767 and '824 Patents.[14]  *See* Applera's SJ Brief at 23-24.  However, Applera has failed to demonstrate that the Kasai reference teaches **each and every limitation** of **each and every claim**, as required to prove

---

[14] Plaintiffs note that the purported invalidity claim charts accompanying Dr. Kricka's declaration completely omits any analysis of claims 13 and 47 of the '767 Patent.  *See* Kricka Decl. Appendix A.  Similarly, Dr. Kricka's statement that "Kasai discloses labeling of oligo- or polynucleotides of claim 70 with fluorescein" is simply wrong on its face.  *See* Sherman Decl. at ¶ 41.  Kasai utilized a danysl chloride, not fluorescein.  Thus, at least with respect to these claims, there is no genuine dispute that Kasai is not anticipatory.

anticipation. *Bristol-Myers Squibb,* 246 F.3d at 1374. For one, Applera has not shown that Kasai is an enabling reference, a prerequisite for establishing anticipation. Moreover, Applera has failed to rebut Plaintiffs' expert's testimony that Kasai fails to teach certain limitations of the asserted claims.

### a.    Kasai Is Non-Enabling.

Dr. Sherman's declaration, submitted concurrently with this memorandum, details why Kasai is not an enabling reference. As Dr. Sherman explains, the Kasai reference fails to apply the level of experimental rigor required by ordinary practices in organic chemistry concerning the disclosure of a new chemical compound. *See* Sherman Decl. at ¶ 33-40. Indeed, the results of Kasai are qualified at all levels using words such as "suggesting" and "indicating". *Id.* at ¶ 36. The concluding sentence of the reference says only that the supposed compounds "should be useful" in conformation studies. *Id.* This language itself suggests that it was not clear even to the authors what the compound was or that it could be utilized for its purported purpose, much less utilized in hybridization studies. *Id.*

Moreover, Figure 1 of *Kasai* depicts a low resolution polyacrylamide gel electrophoresis showing broad bands of untreated tRNA Tyr preQ1, presumed dansyl Tyr preQ1, and a mixture of the two. *Id.* at ¶ 37. In each case, only a single band is observed. *Id.* The poor resolution obtained by this method is evident from the inability to separate putative starting materials and the product of the two resolved bands. *Id.* According to Dr. Sherman, one of ordinary skill in the art would question whether or not this compound was ever actually made. *Id.*

Similarly, Figure 2 provides inadequate characterization of the experimental samples and fails to meet minimal requirements for the proper characterization of novel chemical compounds. Sherman Decl. at ¶ 38. For instance, there is no positive control in the experiment showing that there is an authentic dansyl-preQ1. *Id.* This alone necessarily puts in doubt the experiment's

purported result.  *See id.*  Furthermore, the purported results of the experiment is qualified by the authors themselves, who state that the results merely "indicate" that dansylation occurred at the preQ1 moiety of the tRNA Tyr preQ1.  *Id.* at ¶ 39.  In fact, the dansyl chloride used under these conditions could have reacted with additional free amino groups on the purine ring or free amino groups on the cytosine or adenine basis.  *Id.*  No information is given in Kasai as to the fundamental physical nature of the isolated, purified dansylated preQ1 species, and thus it is impossible to tell whether the compound was ever even made, or could have been made.  *Id.*

Applera's expert, Dr. Kricka, attempts to rebut Dr. Sherman's analysis by suggesting that, even if Kasai did not disclose the dansylated pre-Q1 molecule, "the combination of two well-characterized compounds, dansyl and the preQ1 deazaguanine of tRNA$^{tyr}$," is a simple reaction.  Applera's SJ Brief at 27-28, fn. 10.  But as Dr. Sherman explains in his declaration, this is simply not the case.  *See* Sherman Decl. at ¶ 39.  In fact, a simple reaction of these two compounds would not necessarily lead to the dansylated pre-Q1 molecule depicted in Kasai.  *Id.* Further, it is unclear what the basis for Dr. Kricka's assertion is given his lack of experience with attaching labels to nucleic acids.  Perez Decl. Ex. 22 at 209:13-16 (Tr. Kricka Depo.) (Q:  Have you had experience with the direct attachment of fluorescent labels to oligonucleotide probes? A:  No.).

In sum, Kasai fails to apply the rigorous chemical characterization methods typically used and understood by persons skilled in the art.[15]  Sherman Decl. at ¶¶ 32-48.  As such, the purported synthesis of any new compounds must be viewed with strong skepticism in the first instance.  At a minimum, Dr. Sherman's and Dr. Kricka's disagreement on what Kasai actually

---

[15] Dr. Sherman's declaration details the rigors that are required to demonstrate that an organic compound has actually been made.  Dr. Sherman does this through critical analysis of the results obtained in Kasai and the chemical synthesis described therein.  *See, e.g.*, Sherman Decl. at ¶¶ 33-40.

discloses is a genuine issue of material fact regarding whether Kasai is an enabling reference for section 102 purposes, and thus summary judgment is improper.

> **b.    Kasai Fails To Disclose Each And Every Limitation Of The Asserted Claims of the '767 and '824 Patents.**

Applera contends that Kasai discloses each and every limitation of the asserted claims, and relies on the declaration of its expert, Dr. Kricka.  Applera's SJ Brief at 21-31.  But as Dr. Sherman explains in his declaration, Dr. Kricka fundamentally misunderstands the nature of the compounds disclosed in Kasai.  Sherman Decl. at ¶¶ 41-55.  The dansylated pre-Q1 molecule depicted in Kasai — the compound that Applera bases its allegation of anticipation on — is a molecule derived from a naturally occurring 7-deazapurine base substituted at the 7-position.  *Id.* at ¶ 42.  This naturally substituted 7-deazapurine — referred to as preQ1 in Kasai — is *specifically excluded* from the claims of the Ward Patents based on an explicit disavowal in the specification, which states: "Moreover pyrimidines and 7-deazapurines useful in this invention *must not be naturally substituted at the 5- or the 7- positions*, respectively."  *See* Perez Decl. Ex. 6 at 7:64-67 ('824 Patent) (emphasis added).  Thus, one of ordinary skill in the art reading the Ward specification would recognize that 7-deazapurines naturally substituted at the 7-position, such as the preQ1 compounds purportedly disclosed in Kasai, are specifically excluded from the claimed invention.  Sherman Decl. at ¶ 42.

Applera argues that this is an improper importation of limitations from the specification into the claims.[16]  *See* Applera SJ Brief at 26-27.  This is simply not the case.  As *Phillips* held, "[i]mportantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the

---

[16] The Court did not address the meaning of the claim term 7-deazapurine at last year's claim construction hearing.

entire patent, including the specification." *Phillips*, 415 F.3d at 1313.  As Dr. Sherman explains,

a person of ordinary skill in the art would understand that the claims of the Ward Patents are

necessarily limited by the unequivocal disavowal in the specification, which clearly excludes

bases naturally substituted at the 7-position, such as the dansylated pre-Q1 purportedly disclosed

in Kasai.  Sherman Decl. at ¶¶ 42-43.  Therefore, according to Dr. Sherman, even if the

dansylated pre-Q1 molecule had been made (which is dubious), it still could not anticipate the

asserted claims because the inventors intentionally excluded such compounds from the scope of

the claims.  *Id.*

Yet another disputed issue is whether the naturally occurring aminomethyl functional

group of the dansylated pre-Q1, if interpreted as a "linkage group" (as Applera argues), would

result in "substantial interference" with the hybridization and/or detection of the signal.  As Dr.

Sherman explains in his declaration, the aminomethyl group would in fact not provide sufficient

rigidity to prevent significant interference with hybridization of a complementary

polynucleotide.  *Id.* at ¶¶ 44-46.  Indeed, Dr. Sherman predicts, based on the flexibility of this

functional group and the concomitant high degree of motion, there would be significant

interference due to free rotation about the single bonds.  *Id.* at ¶ 44.

Applera also charges that Kasai anticipates the asserted claims of the '824 Patent.  These

claims recite "[a] method of detecting the presence or absence of a nucleic acid in a sample" and

contacting the sample "under hybridizable conditions."  As Dr. Sherman points out in his

declaration, however, the tRNA disclosed in Kasai is utilized for conformational

characterization, not for detecting the presence or absence of a nucleic acid in a sample.  *Id.* at

¶¶ 51-53.  Moreover, Kasai does not even disclose hybridization between two complementary

polynucleotides, as required by the claims.  *Id.* at ¶ 53.  Rather, Kasai discloses the hybridization

of a polynucleotide to a stimulated ribosome.  *Id.*  Additionally, Kasai is directed to the use of

poly(U,A,C) or poly(U2, A) nucleic acids.  *Id.* at ¶ 54.  These nucleic acids are non-naturally occurring, and thus do not derive from a living organism, such as a prokaryote or a eukaryote, as required by claims 32 and 33, respectively.  *Id.*

In sum, there are numerous issues of material fact in dispute, including whether Kasai is enabling, and if so, whether the compound it purports to disclose meets each and every limitation of the asserted claims.  Viewing all of the evidence in the light most favorably to Plaintiffs, as the Court must, Applera has failed to establish that it is entitled to summary judgment of anticipation as a matter of law.  *Helifix Ltd.*., 208 F.3d 1339, 1345 (Fed. Cir. 2000).

### 3. Pingoud Fails To Anticipate The Asserted Claims Of The '767 And '928 Patents.

Applera cites to Pingoud as anticipating the asserted claims of the '767 and '928 Patents.[17, 18]  As with Kasai, however, there is a genuine dispute as to the threshold question of whether Pingoud is even an enabling reference for section 102 purposes.  After evaluating the Pingoud reference, Dr. Sherman concludes that there is no way to verify that the compounds purportedly disclosed in that reference were in fact made.  Sherman Decl. at ¶ 58.  As Dr. Sherman explains, Pingoud, like Kasai, lacks the experimental rigor ordinarily utilized in organic

---

[17] Applera is not asserting that the claims of the '824 are anticipated by Pingoud.

[18] In its Brief, Applera provides ***for the first time*** its analysis of how Pingoud anticipates the asserted claims of the '928 Patent.  (Applera notes in its Brief that Dr. Sherman failed to address this issue in his report.  *See* Applera's SJ Brief at 34.  This is incredible considering that Applera had not even raised the issue prior to its filing the instant summary judgment motion.  Dr. Sherman is not in the practice of addressing arguments that have never been made.)  Plaintiffs object to these eleventh-hour assertions as too little, too late.  The Court issued its claim construction five months ago, discovery closed over two months ago, and Applera is only now providing these invalidity contentions.  Plaintiffs have not had adequate time to respond to these contentions, and therefore respectfully requests that the Court preclude Applera from relying on them.  In any event, as discussed *infra*, Applera's contentions have no merit.

chemistry practice at the time.  *Id.*  For example, Pingoud fails to disclose the structure of the

FITC-tRNA Tyr purportedly synthesized.  *Id.*

Furthermore, even if the FITC-tRNA Tyr had been synthesized and characterized in

Pingoud, the Q base disclosed in that reference, as in Kasai, is a naturally occurring base that is

modified at the 7-deazapurine position.  *Id.* at ¶ 59-60.  Therefore, this nucleotide base is

specifically excluded from scope of the asserted claims.  *See* Perez Decl. Ex. 6 at 7:64-67 ('824

Patent) ("Moreover, pyrimidines and 7-deazapurines useful in this invention **must not** be

naturally substituted at the 5- or 7- positions, respectively.") (emphasis added).  Given that the

naturally substituted Q base portion of the compound purportedly disclosed in Pingoud is

specifically excluded from the scope of the claimed invention, the reference cannot possibly

anticipate the asserted claims.

Moreover, as Dr. Sherman explains in his declaration, even if the dihydroxy-

cyclopentenyl-aminomethyl functional group of the FITC-tRNA Tyr is interpreted as a "linkage

group" (as Applera argues), it would nonetheless result in "substantial interference" with the

hybridization and/or detection of the signal.  Sherman Decl. at ¶¶ 61-61.  Specifically, this

functional group would not provide sufficient rigidity to prevent significant interference in

hybridization involving a complementary polynucleotide.  *Id.*  Indeed, Dr. Sherman predicts that

based on the flexibility of this functional group and the high degree of motion that would be

allowed, there would be substantial interference due to free rotation about the single bonds.  *See

id.* at ¶ 61.  And indeed, this is confirmed by the reference itself, which states: "Codon-anticodon

interaction, however, is ***severely affected*** by the modification."  *Id.* at ¶ 62 (citing Pingoud at

Abstract).

Applera also charges that Pingoud anticipates claims 1 and 2 of the '928 Patent —

"[a]ssuming that 'A' were determined to cover a direct detection system" — because the "A"

moiety allegedly disclosed in Pingoud could be "split into two components: a portion of the fluorescein dye that can independently act as a fluorescent dye and another portion containing at least three carbons." *See* Applera's SJ Brief at 35. Applera's argument is baseless. As Plaintiffs explain in another paper, the Court construed the claims of the '928 Patent as limited to multi-component signalling systems. *See* Perez Decl. Ex. 23 at 8-11 (Plaintiffs' Opposition to Non-Infringement). Fluorescein, on the other hand, is a single-component dye, and thus falls outside the scope of the '928 Patent claims as construed by the Court. *See* Sherman Decl. at ¶ 65; Perez Decl. Ex. 24 at ¶¶ 29-31 (Sinden Decl. Regarding Non-Infringement).

Furthermore, Applera's attempt to "split" the fluorescein dye into pieces is both impracticable and scientifically unsound, as Applera's own expert concedes. *See* Perez Decl. Ex. 25 at ¶¶ 30-31 (Kricka Decl. Regarding Non-Infringement) (arguing that "chopping up" a fluorescent dye is both arbitrary and theoretical). In this context, Dr. Kricka was arguing — for non-infringement purposes — that Applera's BigDye could not be divided into its component dyes (fluorescein and rhodamine) and likened any attempt to do so as akin to chopping up fluorescein into pieces. *See id.* Of course, there is a fundamental difference between a BigDye on the one hand, and a fluorescein dye on the other. Fluorescein consists of a single dye — fluorescein. But a BigDye consists of two separate dyes — a fluorescein donor dye and a rhodamine acceptor dye, connected to one another by a linker arm. Thus, "chopping up" a fluorescein dye into pieces is indeed arbitrary, but distinguishing between the rhodamine dye and fluorescein dye of a BigDye is not. *See* Perez Decl. Ex. 24 at ¶¶ 29-31 (Sinden Decl. Regarding Non-Infringement); *see also* Sherman Decl. at ¶ 64.

In sum, viewing all of the evidence in the light most favorably to Plaintiffs, Applera cannot meet its burden. *Helifix Ltd.*, 208 F.3d 1339, 1345 (Fed. Cir. 2000). There are several issues of material fact in dispute, including whether Pingoud is enabling, and if so, whether the

compound it purports to disclose meets each and every limitation of the asserted claims.  Thus, Applera cannot demonstrate that it is entitled to summary judgment as a matter of law.

### 4.   The Bauman Dissertation Fails To Anticipate The Claims Of The '824, '767 And '928 Patents.

Applera cites to the Bauman dissertation[19] as anticipating several of the asserted claims of the Ward Patents.[20]  *See* Applera's SJ Brief at 39.  But again, Applera has failed to demonstrate that there are no issues of material fact in dispute with respect to this reference .

For one, the Bauman dissertation cannot, as a matter of law, anticipate claims 18, 19, and 21 of the '824 Patent and claims 67, 68 and 70 of the '767 Patent.  The Court has held that these claims  "teach[] direct detection, with 'A' comprising an indicator molecule."  Perez Decl. Ex. 1 at 7-8 (Claim Construction Ruling).  But Bauman only describes a method of indirect detection, as Applera readily acknowledges.  *See* Applera SJ Brief at 36 ("Chapter VIII of the Bauman Thesis describes a method of ***indirect detection*** …") (emphasis added).  Specifically, Bauman relies on a mercury attached to a glutathione to link the nucleotide base uracil to a trinitrophenyl group (TNP).  Sherman Decl. at ¶ 68.  This TNP group is then reacted to form a complex with an anti-TNP antibody, which in turn is subsequently reacted with a labeled antibody.  *Id.*  Accordingly, since Bauman only describes indirect detection, and since dependent claims 18, 19, and 21 of the '824 Patent and claims 67, 68 and 70 of the '767 Patent are all limited to direct detection, Bauman cannot anticipate these claims.

---

[19] Applera has not provided Plaintiffs or the Court with the Bauman dissertation; instead it relies on selected portions of the dissertation.

[20] Importantly, Applera is not asserting that claims 32 and 33 of the '824 Patent or claim 8 of the '767 Patent are anticipated.  Thus, there appears to be no genuine dispute that Bauman does not anticipate these claims.

As for the remaining asserted claims at issue, Bauman fails to disclose each and every limitation of these claims. The most prominent failing of Bauman is that the described linkage group used to attach the TNP to the uracil — the mercury-glutathione linker — "substantially interferes with the characteristic ability of the oligo- or polynucleotide to hybridize with a nucleic acid," and thus fails to meet at least this claim element.[21] *See* Sherman Decl. at ¶ 72. As Dr. Sherman explains in his declaration, mercury atoms, particularly when used as part of a linkage group, fail to withstand standard hybridization procedures. *Id.* For instance, the carbon-mercury bond or mercury-sulfur bond degrade at temperatures required for standard hybridization experiments. *Id.* In addition, the mercury bond typically would not be expected to survive typical work-up conditions for isolation of hybridized DNA (*e.g.*, phenol extraction). *Id.* Indeed, addressing the issue of the inherent instability of the mercury bond, Bauman notes the importance of "avoiding exposure to excess sulfhydryl-compounds and high temperature" — just the sort of conditions typically employed in standard nucleic acid hybridization methodologies. *Id.* (citing Bauman at 162).

Accordingly, the mercury-glutathione linkers described by Bauman "substantially interfere with the characteristic ability of the oligo- or polynucleotide to hybridize with a nucleic acid."[22] *See* Perez Decl. Ex. 6 at 3:22-25 ('824 Patent) ("Moreover, these nucleotide derivatives are ***chemically stable*** and can be expected to have functional shelf-lives of several years or

---

[21] Applera's expert, Dr. Kricka, suggests that the mercury-glutathione is actually part of the "A" moiety, rather than the linkage group. *See e.g.*, Kricka Decl., Appendix A at 19. This is flat wrong. As Dr. Sherman explains, the TNP is the signalling moiety; it is the TNP, not the mercury-glutathione, that complexes with the antibody to generate the detectable signal. Sherman Decl. at ¶ 73. In apparent recognition of the feebleness of this argument, Applera does not raise it in its Brief.

[22] The impracticality of mercury linkage groups for hybridization methodologies is evidenced by the fact that Dr. Ward himself, who had pioneered the use of mercury linkage groups, abandoned them in favor of the linkage groups disclosed in the Ward specification.

more.") (emphasis added); *id.* at 6:55-59 ("Fourth, the detection system should be capable of interacting with probe substituents incorporated into both single-stranded and double-stranded polynucleotides in order to be ***compatible with nucleic acid hybridization methodologies***.") (emphasis added); *id.* at 7:3-8 ("Finally, the linkage that attaches the probe moiety ***should withstand all experimental conditions*** to which normal nucleotides and polynucleotides are routinely subjected, ***e.g., extended hybridization times at elevated temperatures, phenol and organic solvent extraction, electrophoresis, etc.***") (emphasis added).

Finally, Bauman utilized non-naturally occurring nucleic acid sequences, such as poly(U) sequences and the like, for his experiments.[23]  These nucleic acids do not derive from a living organism, such as a prokaryote or a eukaryote.  Sherman Decl. at ¶ 76, fn. 9.  Accordingly, Bauman cannot anticipate claims 32 and 33 of the '824 Patent.

In sum, there are several disputed issues of material fact with respect to the teaching of Bauman.  Any one of these dispute issues, viewed in light most favorable to Plaintiffs, defeats Applera's motion for summary judgment.  *Helifix Ltd.,* 208 F.3d 1339, 1345 (Fed. Cir. 2000).

---

[23] The use of *Bauman*'s homopolymers also fails to meet the limitations Claims 32 and 33 of the '824 patent which are directed to sequences from living organisms.

## V.    CONCLUSION

For the foregoing reasons, Applera's motion for summary judgment that the asserted claims of the Ward Patents are allegedly invalid for failing to meet the requirements of 35 U.S.C. §§ 112 and 102 should be denied.

Respectfully submitted,

Dated:  March 26, 2007

By Counsel:

Edward R. Scofield (CT00455)
Marie A. Casper (CT08974)
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
P.O. Box 1740
Bridgeport, Connecticut  06606-1740
(203) 333-9441

Scott L.  Robertson (CT20318)
Jeffrey T. Perez (CT26465)
**HUNTON & WILLIAMS**
1900 K Street, N.W.
Washington, D.C.  20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

David A.  Kelly (CT26466)
**HUNTON & WILLIAMS**
600 Peachtree Street, N.E.
Suite 4100
Atlanta, GA 30308-2216
Telephone:  (404) 888-4000
Facsimile:  (404) 602-8671

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2007, a copy of the foregoing MEMORANDUM OF

LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO APPLERA'S MOTION FOR

SUMMARY JUDGMENT OF INVALIDITY OF THE WARD PATENTS was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be send by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing.  Parties may access this filing through the Court's CM/ECF System.

Jeffrey T. Perez