# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ENZO BIOCHEM, INC., ENZO LIFE SCIENCES, INC., and YALE UNIVERSITY,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | **CIVIL ACTION NO. 3-04-CV-929(JBA)** |
| **v.** | ) ) | |
| **APPLERA CORP. and TROPIX, INC.,** | ) ) ) | |
| **Defendants.** | ) | |

## <u>DECLARATION OF DAVID H. SHERMAN, PH.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO APPLERA'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY</u>

I, David H. Sherman, Ph.D., declare, depose and state the following:

## I.        INTRODUCTION

1.        My name is David Howard Sherman.  I am a Professor of Medicinal and Organic Chemistry at the University of Michigan in Ann Arbor, Michigan.  My business address is 210 Washtenaw Avenue, Ann Arbor, Michigan 48109-2216.  I have been involved with nucleic acid and small molecule organic chemistry for over 25 years.   I am also Director of the Center for Chemical Genomics, Life Sciences Institute at the University of Michigan since 2004.  I am over eighteen years of age, and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial.  A copy of the Curriculum Vitae is attached as Appendix A.

2.        I have been retained by counsel for Plaintiff as a technical expert with respect to the proceedings currently before this Court in the above-captioned matter.  I receive compensation in the amount of $400.00 for every hour that I devote to providing the expert analysis and testimony requested of me in this case.  I have also been reimbursed for my travel and other expenses that I have incurred in connection with providing this technical analysis and testimony.

3.        For purposes of this Declaration, I have been asked by Plaintiffs to provide an expert technical analysis and opinion related to U.S. Patent Nos. 4,711,955 ("the '955 Patent"), 5,328,824 ("the '824 Patent"),  5,449,767 ("the '767 Patent") and 5,476,928 ("the '928 Patent")(collectively, referred to herein as the "Ward Patents.") in response to the Declaration of Larry J. Kricka, D.Phil., in Support of Applera's Motion for Summary Judgment of Invalidity (hereinafter referred to as "Dr. Kricka's Declaration.")

4.        In summary, it is my opinion that Dr. Kricka failed to present clear and convincing evidence that any of the claims of the Ward Patents are invalid under any proper

analysis conducted pursuant to patent law principles.

5.  In addition, it appears that many of the statements made by Dr. Kricka are irrelevant to any proper inquiry under patent law and do not address the merits of the alleged invalidity defenses.

6.  My detailed response to the positions taken in Dr. Kricka's Declaration is set forth below.

## II.  MATERIALS REVIEWED

7.  In performing the analysis that is the subject of this Declaration, I have reviewed a number of materials including all of the materials accompanying Dr. Kricka's Declaration.

8.  Further, I have reviewed the documents listed in Appendix B.

9.  I understand that the claims of the '824 Patent that are currently being asserted are Claims 1, 18, 19, 21, 26, 28, 32, and 33; the claims of the '767 Patent being asserted are Claims 1, 2, 8, 11, 13, 42, 46, 47, 48, 49, 50, 51, 67, 68, and 70; and the claims of the '928 Patent being asserted are Claims 1 and 2.

## III.  UNDERSTANDING OF LAW TO BE APPLIED TO INTERPRET THE CLAIMS AND DETERMINE VALIDITY

10.  In formulating my opinions and conclusions in this case, I have been provided with an explanation of the prevailing principles of U.S. patent law that govern the issues of patent claim interpretation and validity.

11.  As a result, I understand that it is a basic principle of patent law that assessing the validity of a patent claim involves a two-step analysis.  In the first step, the claim language must be properly construed to determine its scope and meaning.  In the second step, the claim as properly construed, must be compared to the alleged prior art to determine whether the claim is valid.

12.     In performing my analysis of the prior art in comparison to the claims, I understand that the court in the above captioned matter issued a Claim Construction Ruling on October 12, 2006.  I have reviewed the Claim Construction Ruling and reviewed the prior art references in light of this Court's interpretation of the claims.  Specifically, I understand that in formulating my opinions and conclusions the following claim constructions are controlling:

a)     In the '767 and '824 Patent claims, the phrase "wherein A comprises at least three carbon atoms and represents at least one component of a signalling moiety capable of producing a detectable signal" means that "A comprises at least three carbon atoms and is one or more parts of a signalling moiety, which includes, in some instances, the whole signalling moiety."

b)     In the '767 and '824 Patent claims, the term "signalling moiety" includes, but is not limited to, "a chemical entity capable of producing a detectable signal."

c)     In the '928 Patent claims, the phrase "wherein A represents at least three carbon atoms and an indicator molecule selected from the group consisting of fluorescent dyes, electron-dense reagents, enzymes which can be reacted with a substrate to produce a visually detectable reaction product, and radioisotopes" means that "A must have at least three carbon atoms and an indicator molecule selected from the group consisting of (i) fluorescent dyes, (ii) electron-dense reagents, (iii) enzymes which can be reacted with a substrate to produce a visually detectable reaction product, or (iv) radioisotopes."

d)     In the '928 and '824 Patent claims, the phrase "said linkage group not interfering substantially with," and in the '767 Patent claims, the phrase "linkage group that does not substantially interfere with," means that "the linkage group neither substantially interferes with the ability of the compound to hybridize with the nucleic acid nor substantially interferes with the ability of A to be detected."

e)     In the '824 Patent claims, the phrase "detecting said compound or compounds so as to detect said nucleic acid" means that "the compounds which are detected do not

-3-

necessarily have to remain hybridized to the nucleic acid in order to permit detection of the nucleic acid."

f)  In the '928 Patent claims, the phrase "compound useful as a probe" means "a compound for detecting and/or localizing specific polynucleotide sequences."

g)  In the '928 Patent claims, the term "having" is "a closed term precluding additional elements."

h)  In the '928 Patent claims, the term "comprising" is "an open term" "indicating that more than one moiety could 'comprise' the claimed sequence or compound."

13.  I am also informed and understand that under U.S. patent law each claim of the Ward Patents is presumed valid and each such claim may be invalidated only if Applera presents clear and convincing evidence that it is invalid.  As explained herein, my analysis of the validity of the Ward Patents will be undertaken from the perspective of what would have been known by one of ordinary skill in the art, relevant to the Ward Patents in the early 1980's time frame when Dr. Ward and his colleagues conceived of and reduced to practice the claimed inventions. Whether any of the claims of the Ward Patents is anticipated by the references alleged by the Dr. Kricka to have been publicly disclosed, invented by another, and/or in public use prior to the invention date, or whether any of the claims is rendered invalid by virtue of an inadequate written description in the patent specification is thus determined based on an understanding of a person of ordinary skill in the relevant art.

14.  I understand that the presumption of validity carries with it a presumption that the Patent Examiner did his duty and knew what claims he was allowing.  Therefore, a party challenging the validity of a patent, such as Dr. Kricka here, has an especially difficult burden when the prior art that the challenging party is relying upon in support of its invalidity contentions was considered by the Patent Examiner during prosecution of the patent.

15.     It is my understanding that only information which satisfies one of the criteria for prior art set forth in 35 U.S.C. § 102 may be used in any invalidity analysis under Sections 102 or 103.  Therefore, if information is not properly classified as prior art in one of the subsections of Section 102 or Section 103, then it may not be considered in anticipation or obviousness determinations.

16.     I am informed and understand that for a document to constitute a "printed publication" under Section 102 and thus qualify as "prior art" under the patent laws, Dr. Kricka must provide clear and convincing evidence that the document was publicly distributed and accessible to the public interested in the art.

17.     I am also informed and understand that, in order to be considered prior art that would anticipate or render a claimed invention obvious and invalid, a reference must be enabling and must describe the claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.  In other words, the disclosure within the "four corners" of the alleged prior art document must be sufficiently detailed to enable a person of ordinary skill in the relevant field to make and use the claimed invention.

18.     Furthermore, it is my understanding that to anticipate a patent claim under 35 U.S.C. § 102, a single asserted prior art reference must disclose each and every element of the claimed invention, either explicitly or inherently to a person of ordinary skill in the art.  Also, I understand that in order for a reference to be an anticipating reference, it must describe the claimed subject matter with sufficient clarity to establish that the subject matter existed and that its existence was recognized by persons of ordinary skill in the field of the invention.  In addition, I am informed and understand that in order to establish that an element of a claim is "inherent" in the disclosure of an asserted prior art reference, the extrinsic evidence (or the

-5-

evidence outside the four corners of the asserted prior art reference) must make clear that the missing element is the inevitable outcome of the process and/or subject matter that is explicitly described in the asserted prior art reference, and that it would be recognized as necessarily present by persons of ordinary skill in the relevant field. Inherency, I understand, however, may not be established by mere probabilities or possibilities. In other words, the mere fact that a certain characteristic may result from a given set of circumstances is not sufficient to establish inherency.

19.     I am also informed that even though a prior art reference does not fully anticipate a claim of a patent, a claim may have been, nonetheless, rendered obvious to one of ordinary skill in the art if the differences between the subject matter set forth in the patent claim and the prior art are such that the subject matter of the claim as a whole would have been obvious at the time the claimed invention was made. In addition, it is my understanding that obviousness is a determination of law based on various underlying determinations of fact. In particular, these underlying factual determinations include (1) the scope and content of the prior art; (2) the level of ordinary skill in the art at the time the claimed invention was made; (3) the differences between the claimed invention and the prior art; and (4) the extent of any proffered objective indicia of non-obviousness. I understand that the objective indicia which may be considered in such an analysis include commercial success of the patented invention (including evidence of industry recognition or awards), whether the invention fills a long-felt but unresolved need in the field, the failure of others to arrive at the invention, evidence of copying, unexpected results, and initial skepticism of others in the field, among others.

20.     To ascertain the scope and content of the prior art, it is necessary to first examine the field of the inventor's endeavor and the particular problem with which the inventor was

-6-

involved at the time the invention was made.  Moreover, a determination of obviousness cannot

be based on the hindsight combination of components selectively culled from the prior art to fit

the parameters of the patented invention.  Instead, it is my understanding that in order to render a

patent claim invalid as being obvious from a combination of references, there must be some

evidence within the prior art as a whole to suggest the desirability of making the combination in

a way that would produce the patented invention.  In addition, it is my understanding that in

order to find a patent claim invalid for obviousness, there must be a finding that each element in

each limitation of the patent claim is disclosed or taught by the asserted combination of prior art

references or elsewhere in the relevant prior art.

21.     Therefore, I will analyze Dr. Kricka's allegations of the invalidity regarding the

claims of the Ward Patents using this proper analysis.

22.     In addition, it is my understanding that the issue of whether a patent claim meets

the written description requirement of Section 112 of the Patent Act must be viewed from the

standpoint of one of ordinary skill in the art.  It is my understanding that to satisfy the written

description requirement, a patent applicant must provide a disclosure such that one of ordinary

skill in the art would believe that the inventor was in possession of the claimed invention at the

time the patent application was filed.  In other words, the written description requirement is

satisfied when the text in the patent specification or the drawings, taken as whole, conveys with

reasonable clarity to a person of ordinary skill in the art that the inventor was in possession of the

claimed invention at the time the application for patent was filed.  I understand that the

specification is not required to include the identical wording used in the issued claims.

23.     Further, with respect to the enablement requirement of Section 112 of the Patent

Act, it is my understanding that enablement is also viewed from the perspective of one of

ordinary skill in the art.  To meet the enablement requirement, one of ordinary skill in the art must read the claimed invention on a claim-by-claim basis, and then determine whether or not that person of ordinary skill in the art could make and use the claimed invention based upon the description provided in the patent specification.  It is also my understanding that there is no requirement under the patent laws to disclose a commercially successful embodiment, to disclose production-level details to make the claimed invention, or to disclose details that would be used to optimize the claimed invention.  Rather, the level of specificity required to be disclosed in a patent specification is only that level of detail sufficient to enable the person of ordinary skill in the art to make an embodiment of the claimed invention.

24.     It is my understanding that Section 112, Second Paragraph, of the Patent Act requires that the claim particularly point out and distinctly claim the subject matter for which the applicant regards as his invention.  It is my understanding that whether a particular claim points out and distinctly claims the subject matter of an invention depends on whether a person of ordinary skill in the art would understand what is being claimed, including the metes and bounds of the claims, read in light of the specification.  If a person of ordinary skill in the art would understand when a claim element is satisfied, then the claim is sufficiently definite.

## IV.     PERSON OF ORDINARY SKILL IN THE ART

25.     It is my understanding that my analysis of the interpretation and validity of the asserted claims of the Ward Patents must be undertaken from the perspective of what would have been known or understood by someone of ordinary skill in the art of the Ward Patents.  From analyzing these patents (which share a common specification), it is my opinion that they are directed to a person in the field of nucleic acid chemistry who possesses or could have been actively pursuing an advanced degree in organic chemistry and/or biochemistry at the time of the invention.  Such a person would have been at least a doctoral student or post doctoral researcher

with three to six years of experience.  With over 25 years of experience in the field of organic chemistry, I consider myself able to recognize and understand the level of skill and knowledge of, at least, a person of ordinary skill in the art to which the patents pertain.  I have laboratory experience and am capable of rendering an informed opinion on what the level of ordinary skill in the art was in the early 1980's.  I have worked with dozens of doctoral students and post-doctoral fellows with various levels of laboratory experience.  Therefore, my analysis has been undertaken from the perspective of the person of ordinary skill in the art in the early 1980's.  As reflected in my qualifications set forth above and in Appendix A, I have substantial experience and expertise with nucleic acid detection, structure and design.

## V.        SUMMARY OF OPINIONS

26.     As discussed more fully below, I rebut the Dr. Kricka's allegations that the references cited against the Ward Patents, in particular, the '824, the '767 and the '928 Patents, when utilized alone or in combination, anticipate or render obvious the claims as they have been construed by this Court.  Further, I explain that several of the references cited by Dr. Kricka are not proper anticipatory and/or obviousness references.

27.     I also discussed in my opinion below how Dr. Kricka's Declaration fails to properly assess:

  i.    the references or explain their applicability to the asserted Ward claims as properly construed by the Court;

  ii.   the level of skill and/or the teaching provided in the specification of the Ward Patents with regard to how to directly link A and B moieties as required by certain dependent claims of the '824 and the '767 Patents; and

  iii.  the amount of guidance required by one of ordinary skill in the art with regard to whether or not a linkage group would "substantially interfere" with hybridization and/or detection.

**VI.    BACKGROUND OF THE RELEVANT ART**

28.    In this section, I begin with a brief discussion of the tutorial and relevant technologies described by Dr. Kricka's Declaration.  As an initial matter, I should note that on pages 3-22 of his declaration, Dr. Kricka engages in extensive discussion of the general state of the art along with a discussion of various types of nucleic acid labeling.  However, as Dr. Kricka does not discuss the relevance of these particular references as they apply to any particular asserted claim, neither will I.  I do, however, reserve my right to supplement my declaration to address any one of these references should Dr. Kricka properly apply them to the claims.

29.    I should also note that Dr. Kricka's analysis of certain aspects of the prior art and his discussion of the basics of nucleic acid strand hybridization should be viewed as merely one application of the inventions claimed in the Ward Patents.  For instance, on page 11 (Fig. 6) of his declaration, Dr. Kricka depicts an example of hybridization to a solid support.  It is my understanding that this example is meant to be purely exemplary and is in no way meant to limit what is claimed in the Ward Patents.  Indeed, I understand Applera made this same argument in attempting to limit the scope of the claims during the *Markman* Hearing and the Court properly rejected the argument.  Should Dr. Kricka suggest otherwise, I reserve my right to supplement my declaration.

**VII.    VALIDITY OF THE WARD PATENTS**

  **A.    Overview**

30.    For the purposes of this Declaration, I have considered the alleged prior art cited by Dr. Kricka against the Ward Patents.[1]  Below I provide a list of the purported prior art cited as

---

[1] I understand that Dr. Kricka alleged that Plaintiffs have "not provided any evidence to support a conception date earlier than the filing date of the original Ward patent application on April 17, 1981."  I have been informed that this is incorrect as Plaintiffs responded to

(continued…)

anticipatory in Dr. Kricka's Declaration:

- Kasai H. *et al.,* "Specific Fluorescent Labeling of 7-(aminomethyl)-7-deazaguanosine Located in the Anticodon of tRNA[Tyr] Isolated from *E. coli* Mutant," *Nucleic Acids Res.,* Vol. 7, No. 1, pp. 231-38 (1979) (*Kasai*), *see* Perez Decl. Ex.13**;**

- Pingoud A. *et al,* "Fluoresceinylthiocarbamyl-tRNA[Tyr]: a Useful Derivitive of tRNA[Tyr] (*E. coli*) for Physiochemical Studies," *Nucleic Acids Res.,* Vol. 4, No. 2, pp. 327-38 (1977) ("*Pingoud*"), *see* Perez Decl. Ex.14**;**

- Dale R.M.K. *et al.,* "The Synthesis and Enzymatic Polymerization of Nucleotides Containing Mercury: Potential Tools for Nucleic Acid Sequencing and Structural Analysis," *Proc. Natl. Acad. Sci.,* Vol. 70, No. 8, pp. 2238-42 (1973) ("*Dale 73*");

- Bobst A.M. & Torrence P.F., "Incorporation of Spin Probes into Polynucleotides by Enzymatic Polymerization," *Polymer,* Vol. 19, No. 1, pp. 115-17 (1978) ("*Bobst*");

- Excerpts of the doctoral thesis of Bauman J.G.J., "Cytochemical Detection of Specific Nucleic Acid Sequences: Development and Application of In Situ Hybridisation Methods for Fluorescence Microscopy," pp. 142-69 (publ. Drukkerji J. H. Pasmans b.v. 's-Gravenhage, Netherlands (1980)) ("*Bauman*"), *see* Perez Decl. Ex.15**;**

- Dale R.M.K. and Ward, D.C., "Mercurated Polynucleotides: New Probes for Hybridization and Selective Polymer Fractionation," *Biochem.,* Vol. 14, No. 11 pp. 2458-2469 (1975) ("*Dale 75*"*);*

- Hakam A. *et al,* "Enzymatic Copolymerization of Nitroxide Labelled Uridine Derivatives With Nucleoside Diphosphates," *Int. J. Biol. Macromol.,* Vol. 2, pp. 49-51(1980) ("*Hakam*")**.**

31.     In analyzing Dr. Kricka's Declaration and the prior art cited therein, I applied the

Court's claim constructions in determining whether or not the claimed inventions are anticipated

and/or rendered obvious by any of the references cited by Dr. Kricka.[2]

---

Interrogatory No. 10 on June 24, 2005 citing to lab notebook pages and a conception date of February, 1980.

   [2] I did not feel as though there were any other claim terms that required additional interpretation in order for me to assess whether one of ordinary skill in the art would be able to understand the plain meaning of the claim language.  To the extent that Dr. Kricka has provided an additional opinion on claim terms not specifically construed by the court, I have provided my opinion as to the plain meaning of the claim language.  Generally, however, I felt one of ordinary
(continued…)

**B.**    **The Ward Patents Are Not Anticipated By Any of The References Cited in Dr. Krica's Declaration**

32.    Dr. Kricka's Declaration included several charts attached as Appendix A of his declaration, purporting to show how each reference disclosed the elements of the asserted claims of the '824, '767 and '928 Patents.  I have reviewed these charts and find each reference to be lacking one or more of the specifically recited elements of each of the asserted claims.[3]

**1.**    **Standard for Disclosure with Regard to a Reference and a New Chemical Entity**

33.    Prior to discussing each of the references cited against the Ward patent in detail, there are several concerns I wish to express with regard to the standard that an organic chemist in the early 1980's would have used in order to determine whether or not a new organic molecule had been synthesized.  These standards are the same now as they were in 1980 and are utilized every day in my practice as an organic chemist.[4]  Accepted practice within the field of organic chemistry provides for at least ten different criteria for the characterization of new substances.  A

_____

skill in the art, particularly given the Ward Patent specification would be able to understand the plain meaning of the claim language.

[3] I reserve the right to affirm, update, or modify my opinions in view of other teachings or disclosures or in response to any opinions provided by expert testimony submitted by Dr. Kricka.

[4] The standards discussed above outline the formal guidelines for characterization of new organic molecules from the Journal of the American Chemical Society.  These guidelines have been in force for decades, including the period when Kasai, Pingoud, etc. were published.  The American Chemical Society is the premier chemical society in the world, and its most widely cited journal, the Journal of the American Chemical Society is the most respected international chemical journal. All other respected chemical journals follow similar guidelines for characterization of new organic compounds.  In the absence of fulfilling these guidelines, the journal will not publish an article.  The chemical sciences demand formal, indisputable evidence for the existence of a new chemical entity.  This comes in the form of experimental data that can be used as rigorous proof for the existence of a compound as shown by the author.  In the absence of such rigorous data, the chemical community will not accept the claim that a new compound has been generated.

published paper and/or dissertation lacking a sufficient number of these criteria is not considered, in my view, to provide the necessary disclosure that would enable one of skill in the art to make and use a new chemical substance. The first criteria is that there should be evidence for homogeneity of a purified sample included in the paper and/or dissertation. Typically an organic chemist will accept an elemental analysis as sufficient proof that homogeneity has been achieved. The second criteria is the inclusion of an NMR, HPLC, a GLPC and/or Gel Electrophoresis studies. Third, evidence of the molecular weight should be provided, particularly if elemental analysis was not performed. Fourth, low resolution mass spectrometry data under conditions that minimize fragmentation are an acceptable standard. Fifth, if distinguishing alternative molecular formulas of a similar molecular mass, e.g., within one atomic mass unit, then high resolution mass spectrometry data is required. Sixth, a numerical listing of the characteristic spectroscopic data should be included to support the assigned structure, changes in functionality, and/or unusual chromophores. Seventh, the method of purification used to prepare the samples for characterization should be described so that one of skill in the art can determine the level of contamination that may be present in the sample. Eighth, for crystalline samples, information about the method of crystallization should be included, e.g., solvents, melting point, etc. Ninth, for non-racemic, chiral substances, data should be provided to allow correlation of absolute configuration including, preferably, [α]D space values. Finally, an acceptable method for structure elucidation of suitable crystalline new chemical entities is x-ray crystallography.

> ### 2. *Kasai* Does Not Anticipate or Render Obvious the Asserted Claims of the Ward Patents

34. Dr. Kricka purports that *Kasai* describes a method for labeling a polynucleotide with a fluorescent label and as such anticipates or renders obvious certain asserted claims of the

'824 and '767 Patents.

i.    *Kasai* **Is Not an Enabling Reference**

35.    With regard to Dr. Kricka's analysis of *Kasai* it is worth noting several key

aspects of the *Kasai* reference.  The first is *Kasai* was originally designed to study

conformational characteristics of tRNA during its engagement in protein biosynthesis.

Therefore, this molecule was designed as a reagent useful for conformational studies of tRNA,

not hybridization.  Critically, the *Kasai* paper fails to apply the level of experimental rigor

required by ordinary practices in organic chemistry regarding the description of a new substance.

36.    Indeed, Dr. Kricka pointed to Structure 3 in the *Kasai* paper as disclosing a

dansyl-preQ1.  However, there is no evidence provided in the *Kasai* reference that meets any of

the standards I discussed above with regard to actual proof that this compound was ever made

using the teachings of the reference and the knowledge of a person of ordinary skill in the art.

The results of the paper were qualified at all levels using words such as "suggesting" and

"indicating" throughout the paper. (*See*, page 232, first paragraph, two lines up from the bottom;

page 234, second paragraph, seventh line down; and page 234, second paragraph, final line).

The concluding sentence in the paper says only that the supposed compounds "should be useful"

in conformation studies.  This language itself suggests that it was not clear even to the authors

what the compound was or that it could be utilized for its purported purpose, much less utilized

in hybridization studies.

37.    Moreover, Figure 1 of *Kasai* depicts a low resolution polyacrylamide gel

electrophoresis showing broadbands of untreated tRNA Tyr preQ1, presumed dansyl Tyr preQ1,

and a mixture of the two.  In each case, only a single band is observed.  The poor resolution

obtained by this method is evident from the inability to separate putative starting materials and

the product of the two resolved bands.  One of ordinary skill in the art would question whether or

not this compound was ever actually made.

38.    Similarly, Figure 2 provides inadequate characterization of experimental samples and fails to meet the basic requirements discussed above for the characterization of novel chemical compounds.  More specifically, there is a lack of the authentication standard for the dansyl-preQ1 whose chemical characterization was not completed according to the criteria I discussed above.  Further there is a lack of a positive control in experiments showing that there is an authentic dansyl-preQ1.  Similarly, there is a lack of an experimental sample of dansyl-preQ1 derived from the dansylation of tRNA tyrosine preQ1 or its resolution by electrophoresis or HPLC methods.

39.    Although Figure 2 claims to provide evidence, this is qualified by the authors state that the results merely "indicate" that dansylation occurred at the preQ1 moiety of the tRNA Tyr preQ1.  In fact, the dansyl chloride used under these conditions could have reacted with additional free amino groups on the purine ring or free amino groups on the cytosine or adenine basis.  No information is given in *Kasai* as to the fundamental physical nature of the isolated, purified dansylated preQ1 species (e.g. crystalline, oil, amorphous solid) therefore, there is no clear evidence that the compound depicted in Structure 3 of the figure was ever made.

40.    In sum, the well-accepted rigorous chemical characterization methods described above were not performed in this study.  As such, the purported synthesis of any new compounds must be viewed with skepticism in the first instance.

### ii.    *Kasai* Fails To Anticipate the Claims of the '767 Patent

41.    As an initial matter, I note that Dr. Kricka opines in his declaration that *Kasai* discloses every element of asserted Claims 42, 45, 46, 48, 49, 51, 67 and 68 of the '767 Patent as set forth in detail in Appendix A of his declaration.  However, Appendix A of Dr. Kricka's Declaration provides an analysis of Claims 1, 2, 8, 11, 42, 46, 48, 49, 50, 51, 67, 68 and 70.

Therefore, it is unclear which claims Dr. Kricka believes are actually anticipated by this reference. Furthermore, neither the declaration or the attached chart explains why asserted Claims 13 or 47 are anticipated by or obvious over *Kasai*. Additionally, claim 70 of the '767 Patent is directed to fluorescein, yet Dr. Kricka asserts that it is anticipated by Kasai who purportedly utilized a dansyl chloride.

42.     A key distinction between *Kasai* and the '767 claims that Dr Kricka does not point out in his expert declaration is that preQ1 is a naturally occurring metabolite that has been derived from an *E. coli* mutant strain. This naturally occurring modified 7-deazapurine base therefore is specifically excluded from the Ward Patent claims. It is clear to me from reading the specification that the inventors clearly meant to exclude compounds such as preQ1. Turning to the specification of the '824 patent, Col. 7, lines 64-67 read:[5]

> Moreover, pyrimidines and 7-deazapurines useful in this invention ***must not*** be naturally substituted at the 5- or 7- positions, respectively. (emphasis added).

Therefore, the preQ1 structure disclosed in *Kasai*, if ever made, would <u>not</u> anticipate the Ward Patent's claims because the inventors purposely excluded such naturally substituted preQ1 bases.

43.     Given that the base portion of the compound disclosed in *Kasai*, namely the preQ1, was specifically excluded from the claims of the '767 Patent, the *Kasai* reference fails to anticipate any asserted claim of the '767 Patent.

44.     However, assuming for the sake of argument that *Kasai* is enabling, and assuming that the preQ1 compound is not specifically excluded from the scope of the claims, the compound in *Kasai* would still fail to meet the claim limitations of the '767 Patent. Dr. Kricka

---

[5] For the purposes of this declaration, I, like Dr. Kricka, refer to the specification of the '824 patent when necessary to discuss the specification for any of the Ward patents.

cited to the aminomethyl group at the C7 position of the 7-deazapurine as the primary amino

group that serves as a nucleophile to react with dansylchloride.  However, this aminomethyl

group does not serve as a linker arm.  As discussed above, preQ1 is a naturally substituted purine

which has an aminomethyl moiety as a *functional group*.  Even if one were to assume the

aminomethyl group served as a linker arm for attaching the dansylchloride, the aminomethyl

group would not provide sufficient rigidity to prevent significant interference with hybridization

of a complementary polynucleotide.  Indeed, one would predict based on the flexibility of this

functional group and the concomitant high degree of motion, there would be significant

interference due to free rotation about the single bonds.

45.     Dr. Kricka also interprets the '767 claims with respect to the -CH$_2$-NH- linkage

group in Claim 8 of the '767 Patent.  The actual language of the claim is: "[a]n oligo- or

polynucleotide of claim 1 wherein the linkage group includes the moiety -CH$_2$-NH-."

Accordingly, Dr. Kricka is incorrect when he states that the characteristics of the linkage group

"must be met by the preferred -CH$_2$-NH- linkage group" as this may be only a preferred portion

of the linkage group not the linkage group in its entirety in all instances.

46.     It is worth noting that two-thirds binding strength may seriously hinder one's

ability to utilize the compound for effective experiments, which is consistent with the *Kasai*'s

own observations ("should be useful in studies of conformation of the anti-codon of tRNA").

(*See*, concluding paragraph of *Kasai*).  Critically, however, the experiments reported in *Kasai* do

not include the labeled polynucleotide hybridizing with a complementary polynucleotide.  *Kasai*

describes the analysis of dansylated tRNA preQ1 Tyr in aminoacylation (Figure 4) and in

binding to *E. coli* ribosomes.  Finally, if one presumes that the functional group of the naturally

occurring preQ1 compound is utilized as a linkage group, it does not provide sufficient rigidity to

hold a signalling moiety away from the polynucleotide and prevent interference.

47.    Dr. Kricka also opines in his accompanying claim chart that Claim 2 of the '767 Patent is anticipated by the *Kasai* preQ1 compound bound to dansyl chloride.  Dependent Claim 2 is a Markush claim that specifically recites "wherein B is selected from the group consisting of uracil, cytosine, deazaadenine, and deazaguanine."  I have been informed that a dependent claim includes all the limitations of the claims to which it claims dependency and that it must further limit those claims.  Therefore, Claim 2, like Claim 1, excludes the naturally occurring preQ1 as B for all the reasons discussed above.  However, as one of ordinary skill in the art, I also interpret this claim to exclude the preQ1 compound as it is not a deazaguanine *per se*, rather it is functionalized or derivatized naturally with a 7-(aminomethyl) and therefore excluded from this specifically recited language.

48.    I have detailed several reasons why *Kasai* is non-enabling.   Additionally, I have detailed why, even if viewed as enabling, *Kasai* fails to anticipate the independent claims of the '767 Patent.  I understand that if a reference fails to anticipate an independent claim it necessarily can not anticipate claims that depend therefrom.

### iii.    *Kasai* Fails To Anticipate the Asserted Claims Of The '824 Patent

49.    It is my opinion that *Kasai* fails to disclose every element of asserted Claims 1, 18, 19, 21, 26, 28, 32, and 33 of the '824 Patent.[6]  Dr. Kricka's arguments with regard to *Kasai* and the '767 Patent are essentially duplicative of his arguments with regard to the claims of the '824 Patent, and therefore I incorporate my comments with regard to *Kasai* as discussed above.

---

[6] Dr. Kricka argument with regard to claims 32 and 33 appear to actually be obviousness arguments as he states "it would be understood…that the method could be used." Kricka Decl. at ¶ 77.

50.    Several of the key factors discussed above are:

i.    there is no evidence that the compound disclosed in structure 3 was

ever made;

ii.    the preQ1 molecule is a naturally occurring base which is

specifically excluded from the scope of the claims; and

iii.    the aminomethyl functional group of the naturally substituted

preQ1 compound does not meet the linkage group criteria required

in the claims.

51.    Initially, the only independent claim of the '824 Patent, Claim 1, is directed to "a

method of detecting the presence or absence of a nucleic acid in a sample comprising…."  As I

discussed above, the tRNA disclosed in *Kasai* is utilized for conformational characterization not

for detecting the presence or absence of a nucleic acid in a sample.   Dr. Kricka, on the contrary

states that "*Kasai* describes a method for detecting the presence or absence of the nucleic acids

poly(U,A,C) or poly(U,C) in a sample" and thus allegedly describes the element of independent

Claim 1:

A method of detecting the presence or absence of a nucleic acid in a
sample which comprises the steps of (a) contacting under hybridizable
conditions said sample with at least one compound comprising the
structure…."

However, *Kasai* provides no evidence that dansylated preQ1-tRNA Tyr is hybridized with poly

(U,A,C), or poly (U2, A).  Fig. 5 refers to binding of dansyl preQ1 tRNA Tyr to *E. coli*

ribosomes, "stimulated by poly (U,A,C), or poly (U2, A).  This experimental system is indefinite

and can not possibly provide direct evidence for interaction between preQ1-tRNA Tyr and model

polynucleotides that are not complementary to the tRNA.  Again, there is no direct experimental

evidence provided that the dansylated polynucleotide was ever even generated.

52.    Dr. Kricka also alleges the claims of the '824 Patent are indefinite with regard to the phrase "interfering substantially."  As I discussed above, it is my understanding that the Court has already determined that the claims are definite and provided an understanding of the expression "not interfering substantially."  I interpret the claims and review the prior art in view of the Court's pronouncements in its Claim Construction Ruling.

53.    Dr. Kricka also alleges that *Kasai* "discloses that fluorescently labeled tRNATyr can be used to detect the presence of the nucleic acids poly(U,A,C) or poly(U2, A) in a sample." However, the interactions between supposed dansylated preQ1-tRNA Tyr did not involve hybridization by complementary strands of polynucleotides.  Rather it involved stimulated ribosomes.

54.    Additionally,  *Kasai* is directed to the use of poly(U,A,C) or poly(U2, A) nucleic acid samples.  Even if the compounds of *Kasai* were actually made and satisfy all the elements of the claims, which they do not, poly(U,A,C) or poly(U2, A) nucleic acid samples are not nucleic acids derived from a living organism, or selected from a prokaryote or a eukaryote, as required by Claims 32 and 33, respectively.

55.    I have detailed several reasons why *Kasai* is non-enabling.   Additionally, I have detailed why, even if viewed as enabling, the compounds and disclosure of *Kasai* fail to anticipate the independent claim of the '824 Patent.  I understand that if a reference fails to anticipate an independent claim it necessarily can not anticipate claims that depend therefrom.

### iv.    *Kasai* Fails To Anticipate the Asserted Claims Of the '928 Patent

56.    In a footnote to his declaration, Dr. Kricka asserts that if the '928 Patent is construed to cover direct detection then *Kasai* discloses all the elements of the '928 Patent for the same reasons discussed with regard to the '767 Patent and the '824 Patent.  As discussed in

detail above, *Kasai* fails to anticipate any of the claims of the '767 Patent or the '824 Patent.  As

such, *Kasai* likewise fails to disclose the requisite elements of the '928 Patent.

> ### 3.    *Pingoud* Reference Fails to Anticipate The Claims of the '767 Patent or the '928 Patent

57.    Dr. Kricka states in his declaration that *Pingoud* allegedly discloses every element

of Claims 1, 2, 11, 42, 45, 46, 48, 49, 50, 51, 67, 68 and 70 of the '767 Patent, but relies on his

chart for details.  Unfortunately, it is unclear what claims Dr. Kricka is alleging are anticipated

by *Pingoud* because Claims 8 and 13 are listed in the chart, but are not discussed in the text of

the declaration and Claim 45 is not currently being asserted.  Further, Dr. Kricka states

"Appendix A demonstrates in detail *Pingoud*'s element-by-element anticipation of certain

asserted claims of the '767 Patent and the '824 Patents."  However, Appendix A includes a

discussion of *Pingoud* in the context of the '767 Patent and the '928 Patent, not the '824.  As

such, I address *Pingoud* with respect to the claims of the '767 Patent and the '928 Patent and

reserve my right to supplement my declaration should Dr. Kricka attempt to apply *Pingoud* to the

'824 Patent.[7]

58.    *Pingoud*, similar to *Kasai*, fails to anticipate any of the claims of the '767 Patent

or the '928 Patent.  *Pingoud* again lacks the experimental rigor utilized for accepted practices in

organic chemistry at the time.  The FITC-tRNA Tyr allegedly synthesized in *Pingoud* represents

a presumed new molecule whose structure is not shown in the published manuscript.  Further,

sufficient evidence for the described FITC-tRNA Tyr where FITC has specifically reacted at the

"aliphatic amino group" on the Q base is not provided.  For instance, there is no indication of

---

[7] Dr. Kricka also states that all the claims of the '767 Patent, the '824 Patent and the '928 Patent are obvious in view of Pingoud, yet he fails to provide the requisite detail with regard to this contention.

homogeneity of the preparation described and alleged to be FITC-tRNA Tyr.  Figure 1 purports

to show a pH dependency of the reaction yield involving FITC, however, there is no information

on the products generated by the reaction.  Similarly, the absorption spectra shown comparing

the starting material and the products in Figure 2 do not satisfy the rigorous requirements for

characterization of a new organic compound.  Likewise, the fluorogram of the electrophoresis for

FITC-tRNA Tyr T1-digest depicted in Figure 3 provides no specific structural characterization

for the material migrating at about 2.8 centimeters.  An organic chemist skilled in the art at the

time of the invention would not have considered this compound to be made or characterized with

any enabling disclosure based on the four corners of this document.

   59.  Again, a key distinction that Dr. Kricka does not point out in his expert

declaration is that the Q base used in *Pingoud* is a naturally occurring base that is modified at the

7-deazapurine position.  Therefore, this base is specifically excluded from the Ward Patents'

claims.  It is clear to me from reading the Ward Patents' specification that the inventors clearly

meant to exclude compounds such as the Q base.  The Ward specification states:

> Moreover, pyrimidines and 7-deazapurines useful in this invention ***must
> not*** be naturally substituted at the 5- or 7- positions, respectively. ('824
> Patent, Col. 7, lines 64-67)(emphasis added).

Therefore, the Q base disclosed in *Pingoud,* if ever made, would <u>not</u> anticipate the Ward Patents'

claims because the inventors purposely excluded such naturally substituted bases.

   60.  Given that the base portion of the compound disclosed in *Pingoud*, namely the Q

base, was specifically excluded from the claims of the '767 Patent and the '928 Patent, *Pingoud*

fails to anticipate any asserted claim of the '767 Patent or the '928 Patent.

   61.  Moreover, even if *Pingoud* was enabling, and even if the Q base was included

within the scope of the claims, the compound in *Pingoud* still fails to satisfy all the elements

recited in the '767 Patent claims or the '928 Patent claims.  Dr. Kricka cited to the

dihydroxycyclopentenylaminomethyl functional group at the C7 position of the 7-deazapurine as the primary amino group that serves as a nucleophile to react with fluoresceinylthiocarbamyl. However, this dihydroxycyclopentenylaminomethyl functional group does not serve as a linker arm. As discussed above, the Q base is a naturally substituted purine which has a dihydroxycyclopentenylaminomethyl functional group. Even if one were to assume the dihydroxycyclopentenylaminomethyl group served as a linker arm for attaching the fluoresceinylthiocarbamyl group, the dihydroxycyclopentenylaminomethyl would not provide sufficient rigidity to prevent significant interference in hybridization involving a complementary polynucleotide. Indeed, one would predict that based on the flexibility of this functional group and the high degree of motion that would be allowed, that there would be substantial interference due to free rotation about the single bonds.

62.     Further, Dr. Kricka states that "*Pingoud* was able to detect the label without apparent difficulty." Again, it is worth noting as I discussed above that the aliphatic secondary amino group in the dihydroxycyclopentenylaminomethyl group does not sufficiently constrain the position of the fluoresceinylthiocarbamyl group. However, even if the compound had been made, it would lead to severe interference. My view is consistent with the results of *Pingoud* who concluded that, "Codon-anticodon interaction, however, is severely affected by the modification." (*See*, Abstract)

63.     Dr. Kricka also alleges in his accompanying claim chart that Claim 2 of the '767 patent is anticipated by the Q base bound to the fluoresceinylthiocarbamyl group. Dependent Claim 2 is a Markush claim that specifically recites wherein "B is selected from the group consisting of uracil, cytosine, deazaadenine, and deazaguanine." I have been informed that a dependent claim includes all the limitations of the claims to which it claims dependency and that

it must further limit those claims.  Therefore, Claim 2, like Claim 1, excludes the naturally occurring Q base for all the reasons discussed above.  In addition, as one of ordinary skill in the art I also interpret this claim to exclude the Q base as it is not a deazaguanine *per se*, rather it is functionalized or derivatized naturally with a 7-dihydroxycyclopentenylaminomethyl and therefore excluded from this specifically recited language.

64.      Further, Dr. Kricka also alleges that the fluorescein moiety, can further be divided into two portions.  A portion that can act as a fluorescent dye and a portion containing three carbon atoms.  By doing so Dr. Kricka contorts the fluorescein molecule to meet all the limitations of the "A" moiety in the '928 Patent.  See, Applera's SJ Brief at 35.  Dr. Kricka's approach of subdividing fluorescein into its component parts is impracticable and lacks scientific basis.  In the context of the '767 Patent Dr. Kricka argues that the fluorescein is the whole of the signaling moiety, but changes his interpretation when applying the reference to the '928 Patent. Applera's SJ Brief at 31 compared to 35.  Division of the fluorescein molecule allows for any number of alternative interpretations.  Should Dr. Kricka maintain this approach is feasible, he has provided no evidence why one of skill in the art would not interpret the linker arm to be the entire portion of his newly created subdivision.  As such, there would not be three carbon atoms to meet the claim limitations.  However, Pingoud, consistent with Dr. Kricka's earlier statements, discloses the label as a single molecule, fluorescein.

65.      I have detailed several reasons why the *Pingoud* reference is non-enabling. Additionally, I have detailed why, even if viewed as enabling, the compounds and disclosure of *Pingoud* fail to anticipate the independent claims of the '767 Patent or the '928 Patent.  I understand that if a reference fails to anticipate an independent claim it necessarily can not anticipate claims that depend therefrom.

### 4.   *Bauman* Does Not Anticipate the Claims of the Ward Patents[8]

66.     Dr. Kricka states in his declaration that *Bauman* discloses every element of certain asserted claims in the '824 and '767 patents and all the asserted claims in the '928 patent and again relies on his attached chart for the details.  Unfortunately, it is again unclear what claims Dr. Kricka views as allegedly anticipated in view of this reference, because, for example, Claim 21 of the '824 Patent and Claim 70 of the '767 Patent are listed on page 54 of his declaration, but they are not listed in the chart.

67.     It appears Dr. Kricka and I agree that *Bauman* fails to anticipate Claim 21 of the '824 Patent or Claim 70 of the '767 Patent.

68.     *Bauman* relies on a mercury attached to a glutathione to link the base to a trinitrophenyl group (TNP).  This TNP group is then reacted to form a complex with an anti-TNP which is subsequently reacted with a labeled anti-body.  This is an example of indirect detection.  Indeed, the very figure included in Dr. Kricka's Declaration is captioned - "Figure 1. Reaction scheme for the detection by **indirect** immunofluorescence…" [Emphasis Added].

69.     Initially, I understand this Court's Claim Construction Ruling determined the claims of the Ward Patents are not limited to indirect detection.  *See*, Claim Construction Ruling page 7 ("The Court finds that the plain language and structure of the '824 and '767 patents indicate that these patents cover both direct and indirect detection.")  In particular, the Court cited to Claims 67, 68 and 70 of the '767 Patent and Claims 18, 19 and 21 of the '824 Patent.  *See*, Claim Construction Ruling page 7-8.

70.     With regard to the '928 Patent the Court stated that the "A" moiety in the '928

---

[8] Dr. Kricka did not provided evidence that *Bauman* was available to the public as of March 19, 1980 and therefore, I understand *Bauman* may not be a proper reference against the Ward patents.

Patent "must have at least three carbon atoms and an indicator molecule selected from the group consisting of (i) fluorescent dyes, (ii) electron-dense reagents, (iii) enzymes which can be reacted with a substrate to produce a visually detectable reaction product, or (iv) radioisotopes." (*See*, Claim Construction Ruling page 11.) I understand this to mean that the "A" moiety must comprise at least two component parts, the first component having at least three carbon atoms, and the second component which acts as an indicator molecule.

71.    That said, it is unclear from the text of Dr. Kricka's Declaration how *Bauman* applies at the very least to the dependent claims directed to direct detection. From my review of the charts associated with *Bauman*, Dr. Kricka's interpretation of the direct detection claims is confusing at best. For instance, with regard to Claim 18 of the '824 Patent, it appears Dr. Kricka is asserting that "[t]he 'A' moiety described above comprises or contains the fluorescent moiety fluorescein." However, the fluorescein is a portion of the antibody complex which is clearly an indirect detection technique and is described "above" in Dr. Kricka's chart as such. This creates an irreconcilable inconsistency. As Dr. Kricka's position with regard to the application of *Bauman* to direct versus indirect detection is unclear, I focus my rebuttal on the other aspects of *Bauman* that render it an improper anticipatory reference with respect to any of the Ward Patents' claims.

72.    Dr. Kricka states that *Bauman* builds upon the disclosure of *Dale 75*. While this may be true, *Bauman* contains at least some of the same failings of *Dale 73* and *Dale 75*. Perhaps the most prominent impediment of *Bauman* is the mercury glutathione linkage used to attach the TNP to the uracil. Mercury atoms, particularly as a part of a linker, fail to withstand standard hybridization procedures. (*See*, '824 Patent, Col. 6, ll. 64-68) For instance, the C-Hg bond or Hg-S bond are labile at temperatures required for standard hybridization experiments. In

addition, the mercury bond typically would not be expected to survive typical work-up

conditions for isolation of hybridized DNA (phenol and other organic solvents).

73.     Dr. Kricka indicates in Appendix A, that the portion of the molecule from the Hg

to the tri-ntirophenol group represents A.  Bauman states this is not the case.  Rather, the Hg-

glutathione represents a linker used to attach the tri-nitrophenyl to the base.  It is the tri-

nitrophenyl that is recognized by the antibody, not the linkage group Hg-glutathione.

74.     Additionally, Bauman discloses that the Hg ligand that Dr. Kricka purports does

not interfere with hybridization actually does interfere with hybridization.   Bauman found that

the Hg group must be further reacted stating "the acetate ligand of the mercuri-nucleotides is

replaced by the CN⁻ ion, in order to facilitate hybridization." (Bauman at 143-144)  Following

hybridization Bauman attached the linkage group, glutathione to attach the tri-nitrophenyl.

Bauman expressly states that the glutathione linkage group interferes with hybridization.  In

discussing the linker Bauman states "avoiding exposure to excess sulfhydryl-compounds and

high temperature, it apparently is possible to hybridise mercurated nucleic acids without

appreciable demercuration."  Glutathione is a sulfhydryl-compound.  Therefore, its presence

prior to hybridization would substantially interfere with hybridization through demercuration.

75.     Indeed, as Dr. Kricka indicated, Dr. Ward worked with mercury linkers and found

them to be unsuitable as evidenced by his abandonment of those compounds for those claimed in

the Ward Patents.

76.     *Bauman* also utilized Poly(U) and the like for his experiments.[9]  The use of

unnatural homopolymers provides an increased incidence of hybridization allowing for a greater

---

[9] The use of *Bauman*'s homopolymers also fails to meet the limitations Claims 32 and 33
of the '824 patent which are directed to sequences from living organisms.

amount of interference to occur without resulting in a failure of hybridization.  This is of course

not the normal circumstance under which experiments are run in the real world.

78. I have detailed some reasons why *Bauman* does not anticipate the independent

claims of the Ward Patents.  I understand that if a reference fails to anticipate an independent

claim it necessarily can not anticipate claims that depend therefrom.

### 5. Overview of Remaining References Cited by Dr. Kricka in the Chart as Anticipatory of the Asserted Ward Patent Claims

78. I understand that for the bulk of his declaration, Dr. Kricka relies on the claim

charts in Appendix A.  In the second column, the charts describe certain teachings in, for

example, *Bauman* that presumably relate to the claim elements of a given patent.  However, in

many instances there is no correlation in the second column as to how the passages of *Bauman*

teach or otherwise disclose the elements of the claims.  It has been explained to me and I

understand that in order for a reference to anticipate a claim, each claim element must be

explicitly or inherently disclosed in that reference.  The claim charts fail to set forth the analysis

as to how each of the references made in the second column relate to the claim elements of the

first column.  In addition, in most cases, the claim charts fail to even disclose a specific page

number for the material relied on from the reference.  As a consequence, because Dr. Kricka's

Declaration fails to set forth the required specific analysis of the claim elements, responding to

the declaration is extremely difficult, if not impossible.  Furthermore, it has been explained to me

and I understand that in order for a claim to be rendered obvious by a reference, an analysis of

the scope and content of the prior art, the level of ordinary skill in the art, the differences

between the prior art and the claimed invention, and any objective criteria must be performed.

Although the claim charts are also relied on for an obviousness analysis, the claim charts lack

any meaningful analysis.  It is therefore extremely difficult, if not impossible, to respond to this

declaration in the absence of the required analysis.

                    **v.        *Bobst***

79.        *Bobst* is directed to spin-label experiments.  These spin-label experiments were

conducted to explore the structure-function relationship of various complex biological systems.

*Bobst* utilized a 5-hydroxyuridine TEMPO compound as a study tool.  The use of this compound

to observe potential interactions has a very limited and specific purpose.  While this compound is

observable prior to hybridization, the compound itself is not observable once the compound has

hybridized.  Indeed, the reference shows a diminished signal resulting from the shielding of the

radical species on the spin-label modified base.

80.        Spin-label technology is an esoteric and impractical method for detecting nucleic

acids.  ESR spectroscopy is difficult to perform, the signals are transient, fleeting and non-

reproducible.  Furthermore, the experiments in use of spin-labels are not compatible with the

immobilized nucleic acid samples.  As observed in Figure 2, the interaction of the spin-label in

an oligonucleotide duplex leads to severe signal attenuation (decrease), with a loss of signal

being the "reporter" event.  Additionally, my experience with spin-label technology is that often

the interaction is inadequate to detect a signal change resulting in no difference in spectrum

being observed leading to false negative results.

81.        Similar to the other references I discussed, the use of an aliphatic "spacer" that

promotes a high range of motion results in interaction of the "reporter" group with the partner

macromolecule.  This is in direct contrast to the purpose of the Ward patents which are directed

to stable linker arms utilized for preventing substantial interference between the label and the

hybridizing polynucleotide or oligonucleotide.  Additionally, it is worth noting that the spin-

labeled uracil disclosed in this reference is only a model and would not necessarily enable one of

skill in the art to utilize a similarly spin-labeled nucleotide.

                                                     -29-

vi.     *Hakam*

82.     Dr. Kricka's Declaration cites to *Hakam* as allegedly anticipatory of Claims 1, 2, 11, 42, 45, 47, 48, 49, 50, 51, 67, 68, and 70 of the '767 Patent.  The declaration does not apply *Hakam* to the claims of the '928 or the '824 Patent.

83.     In my opinion, however, *Hakam* does not anticipate any of the claims of the '767 Patent because it fails to meet each and every element and recitation of each of the claims. Specifically, Hakam, like Bobst, fails to disclose, and indeed teaches away from a linkage group that does not substantially interfere with the characteristic ability of the oligo- or polynucleotide (or sequence) to hybridize with a nucleic acid and does not substantially interfere with the formation of the signalling moiety or detection of the detectable signal, as required in the '767 Patent claims.

84.     *Hakam*, like *Bobst* is directed to spin-label experiments.  As I discussed above, spin-label technology is at best an esoteric and impractical method for detecting nucleic acids. ESR spectroscopy is difficult to perform, the signals are transient, fleeting and non-reproducible.

85.     The purpose of *Hakam* was to demonstrate that enzyme polynucleotide phosphorylase could be used to introduce a spin-label-modified form of hydroxyuracil.  *Hakam* provides no evidence for duplex formation by spin-labeled oligonucleotides.

86.     Additionally, the discussion of *Hakam*, a scant three paragraphs, acknowledges that interference may occur during duplex formation, even with the specialized model compounds (RUGT,U)n and (A)n.  As I discussed above, the use of unnatural homopolymers provides an increased incidence of hybridization allowing for a greater amount of interference to occur without resulting in a failure of hybridization.  This is of course not the normal circumstance under which experiments are run in the real world.  For instance, the limited use of this compound to observe potential interactions is severely restricted as it is observable prior to

hybridization, but not after hybridization.  Indeed, the reference shows a diminished signal resulting from the shielding of the radical species on the spin-label modified base in Figure 2.

87.    Further, *Hakam* provides no experimental data with regard to the structure of the compound.

88.    In view of at least the above failings in *Hakam* the compounds, if made, fail to anticipate the independent claims of the '767 patent.  I understand that if a reference fails to anticipate an independent claim it necessarily can not anticipate claims that depend therefrom.

### vii.    *Dale 73* and *Dale 75*

89.    Dr. Kricka's Declaration cites to *Dale 73* and *Dale 75* in the chart only as allegedly anticipatory of Claims 1, 2, 11, 13, 42, 46, 47, 48, 49, 50, 51, 67 and 68 of the '767 Patent and Claims 1, 18, 19, 26 and 28 of the '824 Patent.  The declaration does not apply *Dale 73* or *Dale 75* with respect to the claims of the '928 Patent.

90.    In my opinion, however, neither *Dale 73* nor *Dale 75* anticipate any of these claims because it fails to meet each and every element and recitation of each of such claims.  Initially, *Dale 73* appears in the References Cited portion of the '767 Patent and the '824 Patent.  Similarly, *Dale 75* appears in the References Cited portion of the '824 Patent.  I have been informed that this means these references were considered at the Patent Office and ultimately viewed as patentable in view of their disclosure.

91.    As discussed in *Bauman*, the mercury linkage used to attach the various purported moieties in *Dale 73* and *Dale 75* are not generally suitable for incorporation into a polynucleotide.  Mercury atoms, particularly as a linker, fail to withstand standard hybridization procedures.  (See, '824 Patent, Col. 6, ll. 64-68)  For instance, the C-Hg bond or Hg-S bond are labile at temperatures required for hybridization experiments and stringent conditions which often accompany such experiments.

-31-

92.     In addition, mercury bonds typically would not be expected to survive typical work-up conditions for isolation of hybridized DNA (phenol and other organic solvents).  For instance, *Dale 73* discusses the difficulties with obtaining the mercurated nucleosides as they are extremely insoluble and precipitate from the reaction mixtures.  Further, *Dale 73* acknowledge the limited applicability of mercurinucleosides due to potential problems with sulfhydryl exchange.  Similarly, *Dale 75* again discloses the limitations of these mercurated nucleotides stating the mercury-carbon bond is thermolabile even at low temperatures.

93.     Finally, Dr. Ward worked with mercury linkers and found them to be unsuitable as evidenced by his abandonment of those compounds for those claimed in the Ward Patents.

## VIII.   NONE OF CLAIMS ARE RENDERED OBVIOUS BASED ON ANY ONE REFERENCE CITED BY DR. KRICKA ALONE OR IN COMBINATION

94.     I understand that Dr. Kricka opines that all the asserted claims from each Ward patent would have been obvious under 35 U.S.C. § 103(a) based on various unstated combinations and permutations of the each of the references cited in the chart that accompanied his declaration.  In my opinion, none of the possible combinations render any of the claims obvious for the reasons set forth below.

95.     I have already discussed my understanding of the level of skill of a person of ordinary skill in the art with respect to the Ward patents.  Similarly I discussed why the general state of the technology at the time cited by Dr. Kricka is not applicable to the original Ward Patent application as filed or the asserted claims.  In my opinion, the differences between the prior art and the subject matter recited in the asserted claims of the '824, '767 and '928 Patents are substantially different and would be deemed so by one of ordinary skill in the art at the time of filing of the original Ward Patents.  I have already discussed why Dr. Kricka failed to demonstrate that any single piece of prior art anticipates the asserted claims of the '824, '767 and

'928 Patents.  It is also my opinion that the claimed subject matter in those patents would not have been obvious to one of ordinary skill in the art at the time the original Ward Patent application was filed, based on the prior art references cited by Dr. Kricka, alone or in various combinations.

96.     In my opinion, those of ordinary skill in the art at the time the original application for the Ward Patents was filed would not have been motivated to combine two or more of these references and/or use the knowledge they had of the relevant subject matter to arrive at the claimed subject matter.  I previously discussed why several of these references in my opinion would not be viewed as pertinent and/or enabling to one of ordinary skill in the art, particularly, to a small molecule or nucleic acid organic chemist.  As such I will discuss point-for-point Kricka's position why one of ordinary skill would have been motivated to combine these references.

97.     Kricka purports that because a reference cites to another reference there inherently is a motivation to combine these various references.  I have been informed that the law with regard to motivation to combine requires, in addition to the skilled artisan's own knowledge and experience, an actual teaching or suggestion in each reference that one of ordinary skill in the art would turn to, rather than a citation in a long list of references at the tail end of one reference.  Additionally, as I have discussed each reference in some detail before with regard to anticipation, I note that each reference alone fails to disclose the necessary components required to anticipate the claims.  As several of these references lack the very same key aspect to the Ward inventions, even if one were to combine the references, the combined teachings of the prior art still would fail to disclose or suggest all elements recited in the Ward Patents' claims.

98.     Dr. Kricka's second reason that one of ordinary skill in the art would be

motivated to combine these references is that all the references "generally relate to the same art involving the chemical modification of polynucleotides and nucleotides." As I have discussed in detail above, these references are actually directed to various different specific issues within defined fields. For instance, the spin-label technology is technology that is simply used to define structure rather than function. Similarly, *Kasai* and *Pingoud* both were primarily directed to the protein interaction that occurs in the ribosome with tRNA, and not the hybridization of two different strands of nucleic acids. Indeed, I understand Kricka also cited the Dale references, both 1973 and 1975, which have already been submitted to the U.S. Patent and Trademark Office and considered. The Ward inventions were viewed as patentable over these references.

99.    One of the key issues relating to Dr. Kricka's Declaration is his tendency to trivialize the details of the synthetic organic chemistry that is relevant to the recited claims in the Ward patents. While I do not disagree with the level of skill required to utilize this invention, Dr. Kricka's perceived skill level and motivation, particularly with respect to the combination of references does not in my opinion adequately address or appreciate the highly specialized, and innovative nature of the Ward inventions. Specifically, multi-disciplinary fields of scientific endeavor were required for this breakthrough, and are uniquely specified in the Ward patents. It was Dr. Ward's unique ability to apply innovative, general and practical synthetic organic chemistry approaches to the assembly of novel nucleotides, that enabled effective and stable chemical linkages to detectable reporter groups (both direct and indirect) that extended away from a polynucleotide chain, and thus avoided interference during hybridization and detection. It appears to me as though Dr. Kricka is applying today's knowledge and review to various references in obtaining the motivation to combine various references to achieve the claimed invention. Indeed, even with this benefit, I, as an organic chemist, disagree that even with

hindsight a skilled artisan would have combined the reference, and even if combined, the combination of any number of the references would not disclose or suggest the elements recited in the Ward Patents' claims.

**A.      Dr. Kricka's Obviousness Analysis is Based on the Improper Use of Hindsight**

100.     I note that Dr. Kricka fails to indicate the specific combination of references that he relies upon as allegedly rendering obvious each claim.  There are undoubtedly an enormous number of potential combinations of the fifteen references.  I understand that Dr. Kricka has the burden to set forth a specific combination of references that Dr. Kricka contends would have rendered obvious a specific claim.  Thus, I understand that Dr. Kricka's analysis is deficient.

101.     I understand further that, under patent law principles, the determination of obviousness cannot be made based on the hindsight combination of components selectively culled from the alleged prior art to fit the parameters of the patented invention.  That is, one should not consider what is known today in 2007 or what was learned from the teachings of the patents-in-suit.  I understand that one should not use the patents as a road map for selecting and combining items of prior art.  It appears that Dr. Kricka is doing just that.  He alleges that one could "hunt and peck" from among fifteen different documents to attempt to patch together each element of each claim of the patents-in-suit.  I understand that his approach is incorrect.  Instead, in order to render a patent claim invalid as obvious from a combination of references, there must be something within the prior art as a whole, coupled with the knowledge of one of ordinary skill in the art, that would suggest the desirability of making the combination, in a way that would produce the patented invention.

102.     I further understand that, as stated above, to prevent attempts to invalidate patent claims using hindsight, the patent laws require some teaching, suggestion, reason, or motivation

to combine particular references to arrive at the patent claim.  Moreover, I understand that it is insufficient to establish obviousness if the separate elements of the claimed invention existed in the prior art, absent some teaching or suggestion to combine the separate elements.  The test is not whether one device or component can be an appropriate substitute for another.  There must be a specific analysis as to why it would have been apparent to a person of ordinary skill in the art to use a component disclosed in a specific prior art reference in combination with another component disclosed in a second prior art reference.

103.    I also understand that the reason, suggestion or motivation to combine may be found explicitly or implicitly: (a) in the prior art references themselves; (b) in the knowledge of those of ordinary skill in the art that certain references, or disclosures in those references, are of special interest or importance in the field; or (c) from the nature of the problem to be solved, leading inventors to look to references relating to possible solutions to that problem.  While the references need not expressly teach that the disclosure contained therein should be combined with another, the showing of combinability must be clear and particular.

**B.    There Are Objective Indicia Indicating the Non-obviousness of the Patented Inventions**

104.    As I discussed above, I understand that when analyzing whether alleged prior art references render claims invalid as obvious, the court must consider objective indicia that would indicate the nonobviousness of the claimed inventions including, for example, the commercial success of the claimed inventions (including evidence of industry recognition or awards), whether the inventions satisfy long-felt but unsolved needs in the field, evidence of copying, unexpected results, and initial skepticism of others in the relevant field, among other factors.  For purposes of considering these objective considerations, I have reviewed documents produced by the parties in this litigation during discovery and certain public record materials.

105.    Based on the documents I have reviewed, I am aware that Dr. Ward received numerous awards and recognition for his work related to labeled nucleotides.

106.    Moreover, I understand that the commercial success of the patented inventions may also be demonstrated through the commercial success of Applera's accused infringing activity.  According to published commentary and Applera's own comments, Applera's sequencing products have realized commercial success and industry recognition attributable at least in part to the inventions of the patents-in-suit.

## IX.    NONE OF THE WARD PATENT CLAIMS ARE INVALID UNDER SECTION 112

107.    As mentioned above, I have reviewed the Dr. Kricka's Declaration and the contentions therein.  In summary, Dr. Kricka focuses on the "A" moiety as "the whole of the signaling moiety"  that he contends lacks an adequate written description under 35 U.S.C. § 112, first paragraph.  I understand this to be a reiteration of Defendants' claim construction position regarding direct versus indirect detection.  I have been informed that this Court issued a Claim Construction Ruling and found as a matter of law that not only did the claims cover both direct and indirect detection, but that in doing so the specification necessarily provided written description support for such an interpretation.

108.    As with other portions of Dr. Kricka's Declaration, he fails to provide specifics with regard to which claims his contentions are directed.

109.    It is my opinion that the positions taken by Dr. Kricka with regard to this issue are incorrect.  I find written support in the specification for direct detection, as did the Court and Dr. Sinden.  As such, I believe the Ward Patents have a proper written description under 35 U.S.C. § 112, first paragraph.  Further, I believe the Ward Patent specification taken as a whole reasonably conveys to a person of ordinary skill in the art the subject matter of the claimed

inventions, particularly in view of the detailed chemical syntheses and examples.

110.     Should the Court choose to revisit this issue, I am happy to provide the details of my opinion, however as I understand it I am to interpret the prior art in view of the Court's Claim Construction Ruling and believe I have done so.

111.     I disagree with Dr. Kricka's conclusions and note that, in reaching his conclusions, Dr. Kricka appears to misinterpret passages in the Ward Patent specification and the teachings of the Ward Patent specification as a whole.  His approach of taking individual sections of the specification out of context is inappropriate.  I understand that the question to be answered is whether the written description in the patent specification, taken as a whole, would convey to one of ordinary skill in the art that the inventor was in possession of the invention being claimed.  From my review of the specification as a whole I believe they were.

A.     **The "Substantially Interfering" Claim Language is Definite as Previously Determined by This Court**

112.     It appears that Dr. Kricka contends on pages 78-80 (¶¶ 127-131) of his declaration that the phrase "substantially interfering" or language similar thereto in the claims is indefinite in light of the specification.  I disagree with Dr. Kricka's opinion.  In my opinion, the phrase "substantially interfering" is definite and would be readily understood by a person having ordinary skill in the art.

113.     Again, I am informed that the Court's Claim Construction Ruling provided how this term should be construed.  Indeed, I see that Dr. Kricka acknowledges the Court's Claim Construction Ruling in his opinion, yet he purports that there is no basis for the limitation as construed by the Court.

114.     I have independently reviewed the specification of the Ward patents and as one of skill in the art at the time of filing, I find the language of the claims to be definite.  Dr. Kricka

-38-

appears to be reiterating arguments that were in contention prior to the Court's ruling, where the Court has already determined that the claims are definite.

115.    In particular, Dr. Kricka appears to be searching the specification for the exact phrase rather than reading the specification as a whole.  The Ward Patents provide a number of examples and teachings of how the compounds may be used and under what conditions.  '824 Patent Col. 7, ll. 3-8.

116.    Accordingly, it is my opinion that a person of ordinary skill in the art would understand the scope of the asserted Ward Patent claims based on the specification as originally filed and previously determined by this Court.

**B.    The Ward Patents Provide Enablement for the Direct Attachment of B to A**

117.    Dr. Kricka contends on pages 80-81 (¶¶ 132-133) of his declaration that he has evaluated Claim 70 of the '767 patent and Claim 21 of the '824 Patent and concluded that the specification does not describe how direct attachment between "A" and "B" may be accomplished.  I disagree with Dr. Kricka's opinion.

118.    I have independently reviewed the specification of the Ward Patents and as one of skill in the art at the time of filing I believe one of ordinary skill would know how to directly attach "A" moieties given the teachings of the specification.   Again, Dr. Kricka appears to be ignoring certain aspects of the specification.  For instance, while the specification provides a detailed discussion of linkage groups, Dr. Kricka appears to be ignoring the fact that this chemistry would also be relevant to the direct attachment of an "A" moiety.  I understand that the Ward specification focuses on the use of a linker arm, however that does not render the chemistry related to the use of the linker arm, a preferred embodiment, irrelevant to other embodiments, i.e., direct attachment.

119.    Therefore, I disagree with Dr. Kricka and find disclosure in the specification,

particularly in view of the relatively high level of skill in the art for this field, as teaching one of skill in the art how to perform direct attachment.

## X.       CONCLUSION

120.    In the event that additional discovery is made available that is relevant to the issues addressed in this Declaration, I may find it appropriate to revise or supplement my opinions, analysis or conclusions and I reserve the right to do so.  Additionally, I may also be called upon to provide expert testimony in rebuttal to any proofs adduced by Applera in this litigation.

121.    In addition to my testimony at trial, I expect to rely upon exhibits prepared to depict and explain information contained in this Declaration or as rebuttal to testimony by Applera's witnesses.  Any such exhibits will be prepared and identified in advance of trial.

I declare under the penalty of perjury that the forgoing is true and correct.

Dated:  March 26, 2007

David H. Sherman, Ph.D.

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2007, a copy of the foregoing **Declaration of David H. Sherman, Ph.D. in Support of Plaintiffs' Opposition to Applera's Motion for Summary Judgment of Invalidity** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be send by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Jeffrey T. Perez