UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ENZO BIOCHEM, INC. ET AL.,
    *Plaintiffs*,

Civil No. 3:04cv929 (JBA)

    *v.*

APPLERA CORP. ET AL.,
    *Defendants*.

September 10, 2012

RULING ON DEFENDANT APPLERA CORP.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT OF LACHES [DOC. # 172]

In this suit, filed on June 7, 2004, Plaintiffs Enzo Biochem, Inc., Enzo Life Sciences, Inc., and

Yale University (collectively "Enzo") allege patent infringement under 35 U.S.C. §§ 271, *et seq.*, by

Defendants Applera Corp. ("Applera") and Tropix Inc. ("Tropix") with respect to patent 5,449,767

('767—a "Ward Patent"), claims 1, 8, 67, 68, and 70.  Defendant Applera moves [Doc. # 172] for

summary judgment on its affirmative defense of laches to bar Plaintiffs' infringement claim.  For

the reasons that follow, Defendant Applera's Motion will be denied.

I.      Chronology Related to Defendants' Laches Defense[1]

        A.      Negotiations (1994–97/98)

In September 1994, after the '824 patent issued on July 12, 1994, Enzo's Vice President of

Scientific Affairs, Barbara E. Thalenfeld, sent Applera's Alex Andrus an information packet

including some of Enzo's patents "in the area of nonradioactive labeling and detection of nucleic

_____

[1]For a fuller description of the dispute, see the Court's Ruling on Defendants' Motion for
Summary Judgment of Invalidity, No. 3:04cv929(JBA), 2007 WL 2669025 (Sept. 6, 2007).

acids." (Sept. 2, 1994 Ltr. from Thalenfeld to Andrus, Defs.' Ex. 3.)[2] A similar letter was sent that

month by Enzo CEO Elazar Rabbani to President Andre Marion of the Applied Biosystems Division

of the Perkin Elmer Corp., Applera's parent company. (Sept. 29, 1994 Ltr. from Rabbani to Marion,

Pls.' Ex. 44.) The parties began corresponding over the next three or four years, exploring a

potential licensing agreement or "business relationship" between the companies, but ultimately none

was reached.[3] According to  Applera's Vice President of Strategic Business Units, Michael

---

[2] As of May 8, 2012, Enzo no longer claims that the '824 patent is infringed by Applera's products. However, the history of these negotiations is relevant to the parties' communications with respect to the '767 patent, which Plaintiffs still claim is infringed by Applera.

[3] On October 18, 1994, Thalenfeld sent the front pages of several patents to Applera's Vice President of Strategic Business Units, Michael Hunkapiller, and requested that he send Enzo "a product catalog and the appropriate product literature relating to nucleic acid probe technology." (Oct. 18, 1994 Ltr. from Thalenfeld to Hunkapiller, Pls.' Ex. 52.) On October 20, 1994, in advance of a scheduled meeting between the parties, Applera's Senior Patent Attorney, Steve Macevicz, sent Applera's 1992–1993 and 1993–1994 product catalogs to Rabbani, stating: "I am somewhat puzzled by Enzo's expression of concern over [our] products, especially in view of the several patents that you and Ms. Thalenfeld sent us. None of them appear to be particularly relevant to our products." (Oct. 20, 1994 Ltr. from Macevicz to Rabbani, Defs.' Ex. 4.)

Macevicz outlined discussion topics for a January follow–up meeting, including the '824 patent's scope of coverage. (Jan. 13, 1995 Ltr. from Macevicz to Rabbani, Defs.' Ex. 5.) Macevicz's letter stated that according to his "notes from the October meeting," Drs. Rabbani and Engelhardt raised the concern over "whether the production of DNA sequencing fragments terminated with fluorescently labeled dideoxynucleotide terminator products were covered by the claims of the '824 patent." (Id.) On February 10, 1995, the parties signed a Confidential Disclosure Agreement which states, "Confidential information shall be used by [Applera] . . . to explore the application of Enzo's technology and patents to develop products." (Disclosure Agmt, Defs.' Ex. 6 at 1.) On February 22, 1995, Enzo Corporation and Patent Counsel Ronald Fedus sent Macevicz a redacted copy of the Notice of Allowability for allowed claims earlier disclosed by Enzo. (Feb. 22, 1995 Ltr. from Fedus to Macevicz, Defs.' Ex. 7.)

On March 7, 1995, Macevicz wrote to the U.S. Patent and Trademark Office Assistant Commissioner of Patents, Lawrence J. Goffney, Jr., protesting the imminent issuance of the '767 patent: "I want to re–iterate my concern and again ask if something could be done to address this

concern <u>inside the Patent Office</u> prior to the issuance of a third Ward patent;" "This claim covers fluorescently labeled DNA sequencing fragments . . . a key component in all presently and foreseeably available automated DNA sequencing procedures and instruments—that is, a fundamental technology upon which all genome sequencing projects rely." (Mar. 7, 1995 Ltr., Defs.' Ex. 8 (emphasis in original).)  Despite Applera's concerns, the '767 patent issued on September 12, 1995. In 2003, while reviewing the Patent Office's file histories of the Ward Patents, Plaintiffs contend that they first discovered Macevicz's 1995 letter regarding the '767 patent, which Plaintiffs assert breached their confidentiality agreement.

Rabbani sent Hunkapiller a draft distributorship agreement on March 30, 1995, expressing an "interest[] in establishing a business relationship" with Defendants.  (Mar. 30, 1995 Ltr. from Rabbani to Hunkapiller, Defs.' Ex. 9.) Some correspondence followed, and Rabbani clarified to Macevicz that the agreement would include Applera "products for nonradioactive DNA labeling and detection that are related to the scope of Enzo's patents."  (June 29, 1995 Ltr. from Rabbani to Macevicz, Defs.' Ex. 10.)

Applera's Vice President of Intellectual Property Joseph H. Smith undertook a review of the '767 patent and stated to Rabbani that his "preliminary analysis [left him] with some serious questions as to the meaning of the issued claims in this patent." (Oct. 31, 1995 Ltr. from Smith to Rabbani, Defs.' Ex. 11.)  Rabbani responded by letter, summarizing Applera's position that the "dye terminators are attached to the 5-position of dideoxy nucleotides by a triple bond and have been licensed from DuPont under U.S. Patent No. 5,047,519" and that Enzo had not received information on and could not locate in the Applera catalog "the structure, characterization and properties of these terminators," which nucleotides Applera maintained were disruptive to incorporation and hybridization.  (Feb. 5, 1996 Ltr. from Rabbani to Smith, Defs.' Ex. 12.)  Rabbani did not recall Enzo's "try[ing] to get DuPont['s] . . . acknowledgment that the triple bond technology would be covered by the Ward patents," but stated, "DuPont, during the prosecution of the . . . triple bond patent, cited Dr. Ward's P&S paper, I believe."  (Rabbani Dep., Defs.' Ex. 14, at 232.)

On February 17, 1997, Enzo again sent Applera a draft distribution agreement (Feb. 17, 1997 Ltr., Defs.' Ex. 15), to which Applera responded that there "is an appropriate place for Enzo to enter the manufacturing process" and "we would be interested in distributing most if not all of your products," but "we should first discuss a pricing structure for various categories of products" (Apr. 24, 1997 Ltr. from Smith to Rabbani, Defs.' Ex. 16.)  Subsequently, on July 24, 1997, Applera sent Enzo a proposed term sheet meant "to propose a relationship between [Applera] and [Enzo] in regard to DNA sequencing, instrument development for real time genetic analysis, and an equity investment in Enzo."  (Proposed Term Sheet, Pls.' Ex. 58.) Rabbani responded on August 5, 1997, addressing specific points on the term sheet, including that "the investment in Enzo would be at or near market value.  Enzo's position is that the premium paid for the equity should compensate Enzo for past infringement." (Aug. 5, 1997 Ltr. from Rabbani to Hunkapiller, Defs.' Ex. 17.)  Rabbani wrote to Smith on August 15, 1997 also to address issues on the term sheet and to confirm a meeting

Hunkapiller, negotiations permanently terminated in late summer 1997. (Hunkapiller Dep., Defs.' Ex. 18, at 165–66.) By June 11, 1998, Rabbani recognized that Applera "terminated negotiations with Enzo" and asked Anthony White, President of Applera's parent company Perkin Elmer, to "meet with [him] in an attempt to reach an amicable solution to all of the issues between [their] companies." (June 11, 1998 Ltr. from Rabbani to White, Defs.' Ex. 21.) Although Rabbani represents that negotiations continued into 1998 and even in 2000 at a financial conference the parties attended (Rabbani Decl. ¶¶ 33–36), Enzo admits that it lacks any documentary evidence reflecting such discussions. (Pls.' Responses to Defs.' First Requests for Admissions, Defs.' Ex. 22, Nos. 28 & 29.)

B.     Publications

With respect to the DuPont technology, a European patent application for the DNA sequencing method, system, and reagents developed by James M. Prober, et al. was filed on January 7, 1987. (Eur. Pat. Appl. No. 0 252 683, Defs.' Ex. 32.) In the October 16, 1987 issue of the journal *Science*, Prober, et al. published an article entitled "A System for Rapid DNA Sequencing with Fluorescent Chain–Terminating Dideoxynucleotides." (Prober Article, Defs.' Ex. 31.) Enzo's Fedus stated that he became aware of this article by September 11, 1997, as Enzo was "attempting to communicate with DuPont at that time." (Fedus Dep., Defs.' Ex. 33, at 275–76; Sept. 11, 1997 Fax to Curtin, Defs.' Ex. 34.)[4]

---

in Connecticut. (Aug. 15, 1997 Ltr. from Rabbani to Smith, Defs.' Ex. 19.

[4]On November 12, 1997, representatives of DuPont and Enzo met and discussed, *inter alia*, the licensing agreement in place between DuPont and Applera, and in follow–up to this meeting, counsel for DuPont wrote to then–counsel for Enzo on December 18, 1997:

Applera's BigDye Terminators ("BDT") and d-Rhodamine Terminators ("dRT") were described and their chemical structures depicted in "New dye–labeled terminators for improved DNA sequencing patterns," an article by B.B. Rosenblum et al. in *Nucleic Acids Research* (Oxford Univ. Press 1997).  On April 9, 1998, Thalenfeld cited this article in a fax to another Enzo employee. (Apr. 9, 1998 Ltr. from Thalenfeld to Stavrianopoulis, Defs.' Ex. 27.)  The dRT was also diagrammed in Applera's 1998 booklet, "Automated DNA Sequencing: Chemistry Guide," which cites the Rosenblum article in the list of "Literature References."  (Applera Booklet, Defs.' Ex. 35.)

On April 9, 1998, Thalenfeld faxed to Dr. Jannis G. Stavrianopoulis, for whom the Stavrianopoulis patent is named, a copy of "New energy transfer dyes for DNA sequencing," a 1997

---

DuPont at no time made any representations to [Applera], . . . concerning any patents . . . owned by or known to be licensed to Enzo. . . .

You also asked whether DuPont has shared with [Applera], . . . any opinions that DuPont might have regarding the Enzo patents.  DuPont has not shared any such opinions with [Applera]. . . .

DuPont has not contributed to or induced that infringement in any way.  As you know, most of the Enzo patents issued after the [Applera] contract was signed.  It appears that [Applera], for its own reasons, has concluded that it does not require a license under Enzo's patents.  If, as it appears, Enzo disagrees with this conclusion, Enzo should take the matter up with [Applera] directly.

Finally, you asked whether the Agreement was transferred to the purchaser as part of the sale by DuPont of NEN.  In accordance with its terms, the Agreement was transferred as part of the sale of NEN.

(Dec. 18, 1997 Ltr. from Figg to Delucia, Def. Ex. 28.)

article written by L.G. Lee, et al. in *Nucleic Acids Research*.  (Apr. 9, 1998 Fax from Thalenfeld to Stavrianopoulis, Def. Ex. 27.)

C.      Ward's Notebooks

In 2002, Plaintiff Yale learned that Dr. Ward's original lab notebooks had been lost or destroyed, and could not be found when Ward relocated from New Haven to Nevada in summer 2004.  (Soderstrom (Yale Representative) Dep., Defs.' Ex. 26, at 80–84.)  These notebooks included "generally the types of experiments that were done, how they were set up, how they were executed and what the results were."  (Ward Dep., Defs.' Ex. 25 at 99.)  They included "information from [Ward's] lab that might be pertinent to the original invention," including "preliminary results." (Soderstrom Dep., Defs.' Ex. 26, at 233.)

D.      Applera's Business Strategy and Investments

As of 1997, Applera was investing heavily in Celera Genomics ("Celera"), a company whose primary mission is to sequence the human genome.  Enzo contends that Applera's relationship with Celera was initiated long before this time, noting, "[a]nd so in May 1998 when the formation of Celera as a separate operating group of Applera was announced, with Craig Venter at its head . . . , it was the culmination of about 10 years of collaboration between Drs. Hunkapiller and Venter." (*See* Pls' Opp'n at 7; Ex. 14 to Spiegler Dec. [Doc. # 214].)

E.      Enzo's Negotiations with and Lawsuits Against Other Entities

Plaintiffs claim that between 1997 and 2004, in addition to corresponding with Defendant Applera, Enzo was pursuing business negotiations with other companies as well as a lawsuit against

6

Amersham and other defendants over, *inter alia*, the Ward patents.   In April 1999, Enzo was negotiating a licensing agreement with Amersham Pharmacia Life Sciences.   (*See* Apr. 6, 1999 Fax from Rabbani to Evans, Ex. 66 to Spiegler Dec.)

II.    Legal Standard

"Laches is a long–recognized defense to a patent infringement suit that arises when a patent holder neglect[s] or delay[s] . . . bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (internal citations omitted). "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."   35 U.S.C. § 286.

To prevail on summary judgment based on laches, a defendant must establish that there is no genuine issue of material fact that (1) the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and (2) the delay resulted in material prejudice or injury to the defendant. *Gasser Chair Co.*, 60 F.3d at 773. If Defendants establish these two factors, to defeat summary judgment, patentee–Plaintiffs must either prove that their delay was reasonable (or that the six–year laches presumption is inapplicable) under the circumstances, or that a material issue of fact exists as to whether Defendants suffered material prejudice from the delay.   *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1038 (Fed. Cir. 1992).

In *Auckerman Co., R.L. Chaides*, the Federal Circuit advised that "[a] court must also consider and weigh any justification offered by the plaintiff for its delay," and that "[e]xcuses which have been recognized in some instances, and we do not mean this list to be exhaustive, include: other litigation; negotiations with the accused; possibly poverty and illness under limited circumstances; wartime conditions; extent of infringement; and dispute over ownership of the patent." *Id.* at 1033. The Federal Circuit also defined "material prejudice" in this context, noting that it:

> may be either economic or evidentiary. . . . Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. . . .
>
> Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.

*Id.* If the patentee–plaintiffs do not come forward with *either* affirmative evidence of a lack of prejudice *or* a legally cognizable excuse for its delay in filing suit, the two facts of unreasonable delay and prejudice "*must* be inferred.'" *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (citing *Auckerman*, 960 F.2d at 1037).

Even if the elements of laches are established, however, a court need not bar a plaintiff's suit. The application of the laches defense is an equitable matter, and the Court looks to all the facts and circumstances of the case and weighs the equities of the parties. *Gasser Chair Co., Inc.*, 60 F.3d at *773* (citing *Aukerman*, 960 F.2d at 1032). "Laches is not *established* by undue delay and prejudice.

Those factors merely lay the foundation for the trial court's exercise of discretion. Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied." *Id.* (emphasis in original).

III.    Discussion

    A.    Delay

The parties agree on the standard for laches in the patent context, and that laches is presumed if a case is commenced more than six years after a "plaintiff knew or reasonably should have known of the defendant's alleged infringing activities . . . [after] issuance of the patent." *A.C. Aukerman Co.*, 960 F.2d at 1032 (Fed. Cir. 1992) (construing 35 U.S.C. § 282[5]).  A preliminary question, therefore, is what Plaintiffs knew or should have known about Defendants alleged infringement of the '767 patent as of June 7, 1998, six years before this case was filed.

    *1.    Six–Year Presumption*

_____

[5] The statute provides in relevant part:

A patent shall be presumed valid. . . .  The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:
   (1) Noninfringement, absence of liability for infringement or unenforceability,
   (2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title [35 U.S.C. §§ 100 et seq.] as a condition for patentability,
   (3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title [35 U.S.C. §§ 112 or 251].
   (4) Any other fact or act made a defense by this title

35 U.S.C. § 282.

According to Applera, Plaintiffs had actual knowledge of the potential infringement long before the six–year mark. Plaintiffs argue that they could not have reasonably known of possible infringement until 2003, "when during [Enzo's] review of the PTO's file histories of the Ward Patents, Enzo discovered Applera's 1995 letter . . . admitting infringement, . . . Enzo realized that Applera had concealed essential information about its products" (Pls.' Opp'n at 26), that their delay was excusable, and that Defendants should be barred from asserting laches because it willfully infringed the patent.

Applera relies heavily on *Wanlass v. General Electr. Co.*, 148 F.3d 1334 (Fed. Cir. 1998), which granted summary judgment on laches grounds where possible infringement was known before the six–year "critical date" because General Electric's allegedly infringing activities were "pervasive, open, and notorious" and because the subject device was in fact no longer in existence, thereby prejudicing General Electric with respect to evidence.  The court observed that "sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement." *Id.* at 1338.  "[C]onstructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor." *Id.*

Defendants' record evidence shows that Plaintiffs knew of possible infringement more than six years before suit was initiated.  It is undisputed that Enzo first approached Applera about its

patents on radioactive labeling and detection, including the '824 patent, in September 1994 (Sept. 29, 1994 Ltr. from Rabbani to Marion, Ex. 43 to Spiegler Dec.; Sept. 2, 1994 Ltr. from Thalenfeld to Andrus, Defs.' Ex. 3 to Wu Dec.); that Applera sent a letter to Enzo in October 1994 denying that its products were covered by Enzo patents (Oct. 20, 1994 Ltr. from Macevicz to Rabbani, Ex. 4 to Wu Dec.); and that, at the very least, at a meeting between the parties in October 1994 about whether Applera's terminator products were covered by the '824 patent, Enzo officials "raised the concern" over whether these products did infringe (Jan. 13, 1995 Ltr. from Macevicz, Ex. 54 to Spiegler Dec.).

Enzo's draft distribution agreements, sent in March 1995 and February 1997, referred to Applera's past product sales but did not specify which patents covered which Applera products. (Mar. 30, 1995 Ltr. from Rabbani to Hunkapiller, Defs.' Ex. 9; Feb. 17, 1997 Ltr. from Rabbani to Hunkapiller, Defs.' Ex. 15.)  In August 1997, in response to a proposed term sheet from Applera, Enzo's Rabbani wrote that "Enzo's position is that the premium paid for the equity should compensate Enzo for past infringement." (Aug. 5, 1997 Ltr. from Rabbani to Hunkapiller, Def. Ex. 17.)

Six years before this case was commenced, Plaintiffs also had knowledge that Applera had a license from DuPont with respect to the latter's '519 patent and inquired about this license. (Ltr. from Figg to DeLucia, Dec. 18, 1997.) As well, several scholarly articles on dye–labeled terminator–based sequencing of the kind used by defendants, specifically the 1987 Prober article in *Science* and the 1997 Rosenblum article in *Nucleic Acids Research*, were known to Enzo and in any case were publicly available at the time (Sept. 11, 1997 Fax to Curtin, Defs'. Ex. 34; Fedus Dep., Defs.'

Ex. 33, at 270–82; Fax from Thalenfeld to Stavrianopoulis, Defs.' Ex. 27.)  Based on these undisputed facts, Defendants have proven their entitlement to a presumption of delay, as the record shows that Plaintiffs knew, since at least August 1997, of Applera's commercial products, and chose not to file suit until more than six years later, in June 2004.

 2.   Rebuttal

 "[T]he presumption of laches which arises after a defendant proves a six–year delay is a 'double bursting bubble' which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice." *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1293 (Fed. Cir. 1992).  "Delay may be excused by a host of factors, including involvement in other litigation." *Id.* Plaintiffs assert that their delay in suing Defendants was based in part on their having pursued negotiations with numerous other companies at the relevant time, however, Enzo did not begin litigation against these other entities until 2002.  (Fedus Dec. [Doc. # 211] ¶¶ 4–11, 13–16.)

 The Federal Circuit in *Aukerman* cautioned that "the presumption of laches may be eliminated by offering evidence to show an excuse for the delay or that the delay was reasonable, even if such evidence may ultimately be rejected as not persuasive." 960 F.2d at 1038. Because evidence of other litigation may excuse delay, *see Hemstreet*, 972 F.2d at 1293, and evidence of parties' negotiations may excuse delay, the Court holds that Plaintiffs' evidence of other litigation on the Ward Patents and of netotiations terminating by June 11, 1998, is sufficient to "burst" the laches presumption. Even if Plaintiffs' proffered evidence of "reasonable" delay—because of other

litigation, and uncertainty as to whether the negotiations terminated—is ultimately unpersuasive, the Court concludes that Plaintiffs have raised a genuine dispute as to the reasonableness of their delay. As the presumption of delay and prejudice is now "burst," it is Defendants' burden to prove unreasonable delay and prejudice "on the totality of the evidence presented." *Id.* at 1039.

i.      Unreasonable Delay

"With the presumption burst, *Aukerman* requires that a defendant who invokes laches as a defense must affirmatively prove (1) unreasonable and inexcusable delay and (2) prejudice resulting from that delay." *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1293 (Fed. Cir. 1992).

As proof that Plaintiffs' delay was unreasonable, Defendants point out that even if Enzo was pursuing multiple lawsuits, Enzo has not shown that it was unable to pursue these suits concurrently. (Reply at 8.) However, without the presumption in place, the burden is on Defendants to show that Enzo's engagement with other litigation was insufficient to excuse their delay in filing suit against Defendants, on which Defendants' record is silent.

"For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer." *Vaupel Textilmaschinen KG v. Meccania Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed. Cir. 1991) (reversing grant of summary judgment on laches grounds where delay was due to reissue proceedings but plaintiff took prompt action to protect its rights once the patent was in place). "To establish whether such notice was given, the district court must look not only at the actions of the patentee, but also at evidence showing whether the alleged infringer *was in fact* on notice of an existing lawsuit." *Id.* (emphasis in original). The Federal Circuit has held that

the notice requirement can be applied flexibly: "The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant." *Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d at 1033. The record is silent as to whether Plaintiff communicated that its reasons for delay in filing this suit were attributable to other litigation, however, it is undisputed that Plaintiffs were involved in other litigation in 2002 for infringement of the Ward patents, which could enable a reasonable jury to conclude that Plaintiffs' delay was excusable.

Defendants also assert that they "terminated" license negotiations with Enzo in August 1997, which Plaintiffs vehemantly dispute. Plaintiffs claim that negotiations between the parties continued into 2000, relying on Rabbani's "recollection . . . that during a telephone conversation around that time, although there was a disagreement, the negotiations were not terminated in my view." (Rabbani Dec. ¶ 33.) While Defendants point to the June 11, 1998 letter in which Enzo stated that "Applera terminated negotiations with Enzo relating to Applera's sequencing activities and non–radioactive nucleic acid labeling and detection systems covered by Enzo patent claims" (*see* Ex. 21 to Wu Dec.; Rabbani Dec. ¶ 34), this date falls (barely) within six years of Plaintiffs' filing of this lawsuit, although it is equivocal as to whether negotiations had continued to that point. Nonetheless, Defendants have not established a summary judgment record that would entitle them to a conclusion that Plaintiffs' delay was undisputably unreasonable.

ii.      Material Prejudice

Under the second prong of a laches defense, a defendant must also prove that it suffered "material prejudice attributable to the delay," and such prejudice may be economic or evidentiary. Defendants have put forward evidence of both forms of prejudice; however, because they have failed to prove the first requirement of a  laches defense—that Plaintiffs' delay was unreasonable and inexcusable—the Court will not reach the issue of whether Applera has put forth undisputed evidence that Applera had suffered either economic or evidentiary prejudice as a result of Enzo's delay in filing suit. As proof of unreasonable delay and material prejudice are required for a laches defense to succeed, Applera must submit both prongs of its laches defense to the jury.

## VI.   Conclusion

Defendants have proven that they are entitled to a presumption of delay based on the six–year rule, and Plaintiffs have come forward with evidence disputing the presumption that their delay was unreasonable. Accordingly Defendants' Motion [Doc. # 172] for Summary Judgment on laches grounds is DENIED.

IT IS SO ORDERED.

_____/s/_____ _____

JANET BOND ARTERTON, U.S.D.J.

Dated at New Haven, Connecticut, this 10th day of September, 2012.

15